STATE, *ex rel.* ANDREW FULTON, v. GEORGE A. IVES, RALPH SPENCE, and C. L. JOHNSON, as members of and constituting the State Board of Barber Examiners.

167 So. 394.

En Banc.

Opinion Filed March 16, 1936.

Rehearing Denied April 27, 1936.

*Daniel & Thompson,* for Relator;

*Waller & Pepper* and *Roberts & Wells,* for Respondents;

*Philip D. Beall,* as *amicus curiae.*

ELLIS, P. J.—Andrew Fulton is a citizen of Florida and resides in the County of Duval. He is a barber by trade and has been engaged in that occupation for the last eighteen years.

Since the year 1931, during which Chapter 14650, Laws of Florida, was enacted, he has obtained a certificate of registration as a registered barber issued by the Board of Barber Examiners, which was created by the Act mentioned above.

Fulton's last certificate, which was issued in 1934, expired in August of 1935. In July of the last mentioned year he applied to the Board of Barber Examiners for a renewal or the issuing of another certificate of registration. The fee tendered by him as required by the law was accepted by the Board and in all other respects he complied with the requirements of the statute mentioned above. The Board of Barber Examiners, however, refused to issue a certificate of registration to Fulton for the year ending August, 1936, because of the applicant's alleged "failure to live up to the prices as set" by the Board of Barber Examiners in July, 1935, by an order "purporting to fix a minimum price for all work usually performed by Relator as a registered and practicing barber in the City of Jacksonville, Florida."

Fulton thereupon in August, 1935, applied for and obtained from this Court an alternative writ of mandamus commanding the named respondents Ives, Spence and Johnson, as members of the State Board of Barber Examiners to forthwith issue to Fulton a certificate of registration as a registered barber for the period ending August 1, 1936, or that they appear before this Court and show cause why they refuse to do so.

Chapter 14650, Acts of 1931, of which mention is above made, is an Act with a tolerably long title—"Tolerably," because not unsupportable by the constitutional limitations restricting the titles of an Act to a brief expression of its subject. Section 16, Art. III, Const.

The purpose of the Act is to regulate the "Practice of Barbering" in Florida, to create a Board of Barber Examiners with certain powers and prescribing penalties for the violation of the "Provisions" of the Act and "Regulations" thereunder. Section 4151 (24), 4151 (48), Cum. Supp., 1934 C. G. L., 1927.

The law was considered by this Court in Dilustro v. Penton, 106 Fla. 198, 142 South. Rep. 898. In that case the Act was sustained against an attack that it contained provisions unlawfully discriminatory in character between persons engaged in the same class of business or occupation. It was held that the exemptions of persons engaged in certain occupations from the provisions of the Act and which the petitioner claimed constituted the unlawful discriminations were not so "unreasonable or unnatural as to make the application so capricious and arbitrary as to violate the principles of law" relating to the guaranty of equal protection.

In 1935 the Legislature enacted Chapter 16799 (Senate Bill 749) entitled "An Act to regulate and control the barber industry and for this purpose to further enlarge the present powers of the State Board of Barber Examiners of Florida, defining their additional jurisdiction, powers, and duties during the existing emergency and to declare an emergency exists, and providing penalty thereof." It was approved June 7, 1935, by the Governor.

Section 1 declares the Act to be enacted in the exercise of the police power, and its purpose to be to protect the public welfare, public health, public safety and public morals. The section declares that "unfair, unjust, destructive, demoralizing, and uneconomic trading practices have been and are now being carried on in the operation of barber shops in the State of Florida"; that unfair compe-

tition exists between individual barbers to the extent that prices have been reduced by such competition to the point "where it is impossible for an average barber, although working regularly, to support and maintain in a modest manner, a family"; that such condition constitutes a menace to the health, welfare and reasonable comfort of the inhabitants of the State.

The section declares that, in order to "protect the well-being of our citizens and to protect the health of the families and other dependents of the barbers," and the respective patrons of the barbers and promote the public welfare, and due to the "personal touch and contacts manifested and exercised in the barber business, and the subsequent necessity for well-nourished, strong and healthy persons to engage in the barber business," the "barber profession" is declared to be a "business affecting the public health, public interest, public safety and public morals."

The section declares the "present acute economic emergency" to be in part the "consequence of a severe and increasing disparity between the prices of barber work and other conditions, which disparity has largely destroyed the purchasing power of barbers for industrial and sanitary products so necessary in the operation of their business." It is declared that such disparity has "broken down the orderly performing of the duties of the barbering profession and has seriously impaired and injured the families and other dependents of the barbers of the State." It is stated that such condition is due to the "financial inability of the members of the barbering profession to supply their families and other dependents with the reasonable necessities of life.

It is declared that the danger to the public health, safety, welfare and morals is immediate and impending; the "necessity urgent, and such as will not admit of delay in public

supervision and control in accord with the proper standards of the barber profession." Such are declared by the Act to be the facts of legislative determination.

· Then follows seventeen more sections of the Act. Section 2 refers to Chapter 14650, *supra,* and adopts the definition of terms used in that Act. Section 3 empowers the Barber Board to act as a control Board for administering the law and enforcing it. Section 4 invests the Board with general powers making it an instrumentality of the State for attaining the ends recited in the legislative finding, empowers the Board to regulate the "barbering industry," to investigate and regulate as the emergency requires "all matters pertaining to the proper supervision and control for the work of barbers"; to "subpoena barbers, their records, books and accounts and any other person from whom such information may be desired to carry out the purpose and intent of this Act"; to issue commissions, to take depositions of witnesses absent from the State. It empowers any member of the Board or designated employee to issue subpoenas and administer oaths to witnesses. It undertakes to vest the Board with power to enforce obedience to subpoenas issued by it as the same may be enforced by a "judge, arbitrator, referee, or other person duly authorized under the laws of the State," who is empowered to issue such writs, and the Board may act as "mediator and arbitrator" in any controversy that may arise between barbers.

Section 5 empowers the Board to "adopt and enforce all rules and orders necessary to carry out the provisions of this Act." Section 6 provides for investigations by the Board, and for the method of procedure. Section 7 empowers any member of the Board, or designated employee, to enter any place where "barbering is being carried on"

and to inspect books, papers and records for the purpose of ascertaining facts.

Section 8 makes any violation of the provisions of the Act or of any rule or order of the Board lawfully made a misdemeanor and punishable by a fine of five hundred dollars, or by imprisonment not exceeding one year, and each day during which the violation of such order continues is deemed to be a separate offense. The section provides that the Board may apply to any Circuit Court for "relief by injunction" to protect the public interest "without being compelled to allege or prove that an adequate remedy at law does not exist."

Section 9 empowers the Board to decline to grant licenses and to suspend or revoke licenses already granted. It also provides that "No Court other than the Supreme Court shall have power to review, suspend or delay any order made by the Board, with respect to the granting of a license, refusal to grant a license, the granting of a conditioned and limited license, or the suspension or revocation of a license, or enjoin, restrain or interfere with the Board or any member thereof, in the performance of official duties with respect thereto."

Section 10 empowers the Board to require licensees to keep certain records. Section 11 requires each licensee to make reports to the Board as it may require from time to time. Section 12 empowers the Board to ascertain by investigation and proofs "as the emergency permits and requires, what price for barber work in the several counties of the State of Florida, and under varying conditions, will best protect the barber industry of the State and insure a sufficient living wage to the average barber of the State of Florida and his lawful dependents, in the respect(ive) counties of the State of Florida, in which the respective shops

are being operated." The Board is empowered to consider "all conditions affecting the barber profession of the State of Florida, including income necessary to reasonably maintain the family of the average barber in the State" and County of his residence. The Board is required, after making "such investigation" to "fix by official order, the minimum price for all work usually performed in a barber shop." The Act declares that the "public emergency requires that the barbers receive a fair return for their work." To that end the Board is empowered either upon its own initiative or upon the complaint of a representative group of barbers, to determine that the minimum prices for service which were fixed "are insufficient to answer the emergency in that the prices so fixed are not providing the average barber with a sufficient income to properly maintain and nourish his family," in which case the minimum price for service may be raised throughout the State or in any county.

Section 13 provided that no member of the Board shall divulge any information acquired by him in his investigations "except as may be required to carry out the purposes of this Act." A punishment is prescribed for violating the provisions of that section.

Section 14 contains the so-called partial invalidity feature of the Act. It is unique in that it not only seeks to continue in force all parts of the Act not declared by a court of *competent* jurisdiction to be invalid but expressly limits the scope of the judgment to the "clause, sentence, paragraph or part thereof, directly involved in the controversy in which such judgment shall have been rendered."

Section 15 declares the period of emergency, which in the legislative wisdom made the Act expedient or necessary, shall expire June 30, 1937, at which time all powers at-

tempted to be granted by the Act to the Board shall cease and determine.

Section 16 provides that the expenses incident to the "administration of this Act" shall be paid from the funds of the Board.

Section 17 repeals all laws and parts of laws in conflict with the Act, and Section 18 fixed the time when the Act became effective.

On September 30, 1935, the respondents made a return to the alternative writ in which they sought to justify their refusal to issue the certificate of registration to the relator under the provisions of the Act, a synopsis of which has been given.

The return, which consists largely of an argument in attempted justification of that extraordinary bit of legislative activity and establishment of the barber service as among the professional activities which require State regulation through an administrative board with exceptionally broad and extensive powers in the interest of public welfare, health, safety and morals, as the statute declares, contains averments of the Board's activities in the examination of witnesses and investigation of economic conditions prevailing among the barbers in the State, and hygienic state of the barber shops and morale of the barber group, as well as the amount of remuneration necessary to maintain the barbers as family men.

The result of those investigations, which were made in twenty-four "different and strategic points" in the State, so it is averred, led the Board to the conclusion that there were about 3700 active registered barbers in the State; that the "journeyman" barber received from eight to twelve dollars per week for his work, while the "master" barber received about twenty-five per cent. more for his labor

and investment; that such remuneration received by the members of the profession, which presumably includes journeyman members, is inadequate to afford "such members a subsistence for themselves and their families and to provide competent service and sanitary conditions for the furnishing of proper work to the public"; that the profession was greatly demoralized, due to "price cutting and cutthroat competition incident to a desire to destroy the weaker members of the profession on the part of the stronger members and the effort of the weaker members to survive the severity of the general economic depression; that most barber shops were without adequate equipment and without adequate sanitary safeguards; "that the members of the profession generally were required to work too long hours, endangering their health and affecting their competency and reliability in serving the public."

The answer then avers that the Board after such investigation "entered and promulgated" its order "fixing minimum prices to be observed by the barbering profession in the County of Duval," which Fulton, the relator, "declined to observe and comply with."

There was a motion for a peremptory writ notwithstanding the return.

The validity of the Act, Chapter 16799, *supra,* is thus presented because, according to the averments of the return, the respondents in fixing minimum prices to be charged by barbers in Duval County acted in all things within the letter and, as may be said, the spirit of the enactment.

Regardless of the controversy about the nature or character of the vocation of one who for a price renders personal service as a barber to all who demand it and pay for it, whether is is a business, industry, trade, craft or profession, the question is whether the vocation is affected by

a public interest, is a paramount industry and the manner of rendering the service largely affects the health, morals and prosperity of the people so that it is within the power of the Legislature to regulate and regiment the business to the extent that it has attempted in this Act, even though an economic depression exists and barbers in some instances charge a sum for their services too small to adequately support themselves, their families, and supply their shops with improved implements with which to work, cleaned and sterilized razors, combs, brushes, electrical rubber instruments for massaging, towels and unharmful lotions and hair dressings, as well as sanitary shops.

The Fourteenth Amendment to the Constitution of the United States forbids the States to make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, or deprive any person of life, liberty, or property without due process of law, or deny to any person within its jurisdiction the equal protection of the laws.

The right to make contracts of any kind, so long as no fraud or deception is practiced and the contracts are legal in all respects, is an element of civil liberty possessed by all persons who are *sui juris*. See Continental Casualty Company v. Bows, 72 Fla. 17, 72 South. Rep. 278; Ga. Home Ins. Co. v. Hoskins, 71 Fla. 282, 71 South. Rep. 285; Sou. Home Ins. Co. v. Putnal, 57 Fla. 199, 49 South. Rep. 922.

It is both a liberty and property right and is within the protection of the guaranties against the taking of liberty or property without due process of law. German Alliance Ins. Co. v. Barnes, 189 Fed. Rep. 769; Lindsley v. Patterson (Mo.), 177 S. W. Rep. 826, L. R. A. 1915F 680.

It follows, therefore, that neither the Federal nor State

governments may impose any arbitrary or unreasonable restraint on the freedom of contract.

"That freedom, however, is not an absolute, but a qualified right and is therefore subject to reasonable restraint in the interest of the public welfare." Refer to Schmidinger v. Chicago, 226 U. S. 578, 33 Sup. Ct. Rep. 182, 57 L. Ed. 364; Rosenthal v. New York, 226 U. S. 260, 35 Sup. Ct. Rep. 27, 57 L. Ed. 212; Selover, Bates & Co. v. Walsh, 226 U. S. 112, 33 Sup. Ct. Rep. 69, 57 L. Ed. 146; A. C. L. R. R. Co. v. Beazley, 54 Fla. 311, 45 South. Rep. 761; Twin City Pipe Line Co. v. Harding Glass Co., 283 U. S. 353, 51 Sup. Ct. Rep. 476, 75 L. Ed. 1112; Scotch Mfg. Co. v. Carr, 53 Fla. 480, 43 South. Rep. 427; Clay v. Girdner, 103 Fla. 135, 138 South. Rep. 490.

The right to contract is a most valuable right among those recognized by the law. State v. Lehman, 100 Fla. 1313, 131 South. Rep. 533.

Freedom of contract is the general rule; restraint is the exception and when it is exercised to place limitations upon the right to contract the power when exercised must not be arbitrary or unreasonable and it can be justified only by exceptional circumstances. *Ex Parte* Messer, 87 Fla. 92, 99 South. Rep. 330.

Included in the right of personal liberty and the right to private property is the right to make contracts for the acquisition of property. Chief among such contracts is that of personal employment by which labor and other services are exchanged for money or other forms of property. If that right be stricken down or arbitrarily interfered with there is a substantial impairment of liberty in the long established constitutional sense. Such is the language of the Supreme Court of the United States, speaking through Mr.

Justice Pitney in the case of Coppage v. State of Kansas, 236 U. S. 1, 59 L. Ed. 441, 35 Sup. Ct. Rep. 250.

While it is undoubtedly true that it is within the power of government to restrain some individuals from all contracts and all individuals from some contracts, the truth must not be ignored that a citizen's right to pursue any lawful business is "property" and the right to contract for personal services as a means for the acquisition of property is one of the privileges of a citizen of the United States of which he cannot be deprived without invading his right to liberty. See State, *ex rel.* Davis, v. Ross, 97 Fla. 710, 122 South. Rep. 225; Paramount Enterprises v. Mitchell, 104 Fla. 407, 140 South. Rep. 328.

It is within the power of the Legislature to regulate some occupations and not regulate others, but private rights secured by the Constitution must not be invaded and the regulations must operate with substantial fairness upon all persons similarly situated. That doctrine was upheld in the case of Noble v. State, 68 Fla. 1, 66 South. Rep. 153. See also Rast v. Van Deman & Lewis Co., 240 U. S. 342, 36 Sup. Ct. Rep. 370, 60 L. Ed. 679. The last cited case being one involving the validity of Chapter 6431, Laws of Florida 1913, providing for an additional license upon merchants offering with merchandise bargained or sold coupons or profit-sharing certificates.

And in the case of State, *ex rel.* Garrison, v. Reeve, 104 Fla. 195, 139 South. Rep. 817, we held that an ordinance of the City of Miami undertaking to regulate the conduct of a "beauty shop" in the city was within the police power as exercised by a city vested with general police powers. In that case Mr. Chief Justice Buford, speaking for the Court, said in substance that the "barbers trade and that of the beauty culturist are close akin." The learned Justice

could find no case where any court in the country had held that the Legislature was without authority to enact a law regulating the trade, science or profession of barber.

The case of People v. Logan, 284 Ill. 83, 119 N. E. Rep. 913, was cited as authority for the proposition that because the "trade of a barber brings him in direct contact with the persons of his patrons, and careless and unsanitary practices in his trade may induce diseases of the skin. * * * It cannot be said that the *reasonable* regulation of the trade of a barber has no relation to the health and safety of the public." (Italics supplied.)

That authority may be sufficient to justify the enactment of Chapter 14650, Laws of Florida, 1931, defining the practice of barbering and requiring a license or certificate of registration as a condition precedent to practicing the trade and creating the Board of Barber Examiners, etc.

Whether the additional powers attempted to be conferred upon the Board of Barber Examiners by Chapter 16799, *supra,* Acts 1935, is a valid exercise of the police power is a different matter.

There is no controversy here, nor is there any doubt about the proposition, that the liberty of contract is not absolute and universal; that it is subject to the police power of the State to place restrictions upon it in the interests of the general welfare. There is no need to cite authority other than our own decisions upon this proposition. Everglades Sugar & Land Co. v. Bryan, 81 Fla. 75, 87 South. Rep. 58; State, *ex rel.* Davis, v. Rose, *supra;* Whitaker v. Parsons, 80 Fla. 352, 86 South. Rep. 247.

Mr. Justice Whitfield, speaking for the Court in the case last cited, embodied the doctrine in a very few words as follows: "Individual rights to life, liberty and property are in law acquired and enjoyed, subject to the exercise of the

regulating powers of government; and such rights are not protected by the Constitution from the due exercise of such governing powers. The purpose of constitutional government is to secure individual rights subject to valid regulations enacted in the interest of the public good."

It is also true that the courts are the final judges as to what are proper subjects of the police power and the law-making power cannot arbitrarily make that a subject of its exercise which from its nature is not one. City of Jacksonville v. Ledwith, 26 Fla. 163, 7 South. Rep. 885, 23 Am. St. Rep. 558, 9 L. R. A. 69.

It has been said that the police power of the State embraces its whole internal affairs and its civil and criminal polity. It extends to the protection of the lives, health and property of the citizens and to the preservation of good order and public morals. Prigg v. Pennsylvania, 16 Pet. (U. S.) 539, 10 L. Ed. 1060; Boston Beer Co. v. Mass., 97 U. S. 32, 7 Otto 25, 24 L. Ed. 989; Slaughter-House Cases, 16 Wall. (U. S.) 36, 21 L. Ed. 394.

The police power is broad and extensive. It may be exercised for preserving the public health, safety, morals or general welfare and its regulations· may reasonably limit the enjoyment of personal liberty including the right of making contracts. The Supreme Court of the United States has invariably so held. See Holden v. Hardy, 169 U. S. 366. 18 Sup. Ct. Rep. 383, 42 L. Ed. 780; Chicago B. & Q. R. Co. v. McGuire, 219 U. S. 549, 31 Sup. Ct. Rep. 259, 55 L. Ed. 328; Gibbons v. Ogden, 9 Wheat 1; 6 L. Ed. 23; License Cases, 5 How. 504, 12 L. Ed. 256; New York v. Miln, 11 Pet. 102, 9 L. Ed. 648.

Mr. Justice ROBERTS, in the case of Nebbia v. New York, 291 U. S. 502, 54 Sup. Ct. Rep. 505, 78 L. Ed. 840, quoted the language of Mr. Justice BARBOUR in New York v.

Niln, *supra*, to the effect that "it is not only the right, but the bounden and solemn duty of a state, to advance the safety, happiness and prosperity of its people, and to provide for its general welfare, by any and every act of legislation, which it may deem to be conducive to these ends."

In all cases, however, in which that wholesome constitutional doctrine has been announced it must not in the interest of constitutional liberty be forgotten that the regulations adopted in the exercise of the great power must be deemed to be fairly necessary to secure some object directly affecting the public welfare. The Fourteenth Amendment debars the States from striking down personal rights, which, of course, include the right to make contracts for personal service, except as may be incidentally necessary for the accomplishment of some other paramount object and one that concerns the public welfare.

The mere restriction of liberty or of property rights cannot of itself be denominated "public welfare" and treated as a legitimate object of the police power, for such restriction is the very thing that is inhibited by the Amendment. The right to follow any lawful vocation and to make contracts is as completely within the protection of the Constitution as the right to hold property free from unwarranted seizure, or the liberty to go when and where one wills. One of the ways of obtaining property is by contract. The right, therefore, to contract cannot be infringed by the Legislature without violating the letter and spirit of the Constitution. Every citizen is protected in his right to work where and for whom he will. Such were the views of the Supreme Court of the United States expressed in the Coppage case, *supra*.

Whenever the power is exercised by the Legislature to restrain some individuals from all contracts it must be in

cases where the subject matter of such contracts is reasonably deemed to be unlawful or inconsistent with the reasonable regulations of the subject under the police power, or contrary to public policy. Certain kinds of business may be prohibited and the right to pursue a calling may be conditioned.

Mr. Justice ROBERTS in the Nebbia case, *supra,* in a footnote to his opinion, cites a number of such vocations. In that case contracts for the sale of milk by local dealers were restricted by limitations upon the price to be charged and the regulation was upheld. The production of milk in the State of New York was deemed to be of such paramount importance that the public welfare and prosperity of the State in a very large and real sense depended upon it. The power to regulate it, a private business, could be invoked only under the special circumstances in which the property or general health of the entire State in a large measure depended upon it. See New State Ice Co. v. Liebmann, 285 U. S. 262, 52 Sup. Ct. 371, 96 L. Ed. 747.

The Legislature cannot decide the question of emergency and regulation free from judicial review. The legitimacy of the conclusions drawn from the facts is a matter for consideration by the court.

Chapter 16799, *supra,* seeks to place a limitation upon the judicial power of this State by prohibiting any court other than the Supreme Court from reviewing, suspending or delaying any order made by a Barber Board with respect to the granting or refusal to grant a license or the suspension or revocation of a license to a barber or to enjoin or restrain or interfere with the Board or any member thereof in the performance of official duties.

That extraordinary clause would deprive the Circuit Courts of this State of their original jurisdiction and con-

vert the Supreme Court into a court of original jurisdiction instead of a court of appellate jurisdiction in violation of Article V, Sec. 5 and 11 of the Constitution of Florida.

The declaration by the Legislature in the first section of the Act that the public health, safety, welfare and morals would be imperiled by a lack of supervision and regulation of the barber trade to the extent of prescribing the prices to be fixed for barber service by those who have obtained or are qualified under the law to engage in such business is not persuasive nor of helpful significance. The method of reasoning apparently adopted consists of piling one supposition upon another and invoking the arbitrary dictum of legislative expressions as the only test of the truth of them. The assumptions that the barber trade, business, profession or industry variously referred to in the Act is a chief industry of the State of Florida so that its general welfare and prosperity depend upon it in a very large and real sense is a postulate unfounded in history, fact or experience. It is so egregiously erroneous that its illusion may be said to be a matter of common knowledge.

It is unnecessary here to make any invidious comparisons but it would be an easy matter to enumerate fifty or more vocations which might with equal suitableness be said to constitute a paramount industry in this State, the regimentation and regulation of which are necessary to the public welfare, health or morals.

Nor may it be said that perfect consistency of declaration and unity and cogency of thought exist between the declaration in the first section of the Act that the "present acute economic emergency being in part the consequence of a severe and increasing disparity between the prices of barber work and other commodities" and the averments in the return that the "profession in the State was grossly de-

moralized, due to the price cutting and cut-throat competition incident to a desire to destroy the weaker members of the profession on the part of the stronger members and the effort of the weaker members to survive the severity of the general economic depression."

It may be true that general economic conditions have produced unsatisfactory industrial conditions, a large number of unemployables as distinguished from unemployed, and consequent reduction in the price of commodities including personal service, one large class of which is the so-called "white collar" group, in which the barber may be placed not inappropriately, but regimentation of the various industries may not for that reason be deemed essential to the public welfare and health or morals, to secure which the price of such commodities should by legislative fiat be increased and thus put the service to be rendered still further beyond the means of persons in the unemployable class, who may still desire to be shaved and hair-dressed.

Nor does unfair competition in the barber trade by some members of it who desire to expel others from it produce such an economic condition that the police power may be invoked to place in the hands of a small committee the power to interfere with the liberty of contract in relation to a personal service which may not be said to constitute a paramount industry of the State.

Although, by most liberal and perhaps loose reasoning, we have held that the barber trade is in a measure affected by a public interest, that it bears such relation to the public as to warrant its inclusion in the category of businesses charged with a public use, so that reasonable regulations may be prescribed for obtaining permits to engage in it as in the business or profession of the lawyer, doctor,

chiropractor, osteopathist, dentist, professional nurse, optometrist or surgeon, beauty culturist, public accountant and others, yet this Court has never approved a regulation which has the effect of denying or unreasonably curtailing the common right to engage in a lawful private business or trade nor can such unreasonable regulation be upheld in view of the Fourteenth Amendment to the Federal Constitution, nor the first Section of the Bill of Rights of the Florida Constitution.

It may be admitted that the barber trade in some respects bears an analogy to the profession of law, medicine, dentistry, osteopathy and other occupations which require on the part of the practitioner a degree of scientific training, knowledge of hygiene and manual skill necessary to efficient service, yet such professions may not, under the guise of protecting the public, be arbitrarily interfered with by the imposition of unreasonable and unnecessary restrictions. To impose such restrictions as are attempted by the Act in question would be to impose limitations upon certain essentials of liberty, particularly that of contract, with which the State is not entitled to dispense under the form of government which we now enjoy.

The principle underlying the Act is a species of socialistic leveling of merit or capacity in the practitioner wholly inconsistent with the American ideal of encouragement to the worthy and industrious, by placing a handicap upon the proficient artist in the trade who would be in a measure coerced by the minimum price fixed for barber service which may be charged by one who under the provisions of Chapter 14650, *supra,* is equally qualified to practice the trade, to charge a price in reality inadequate to compensate him reasonably for the character of service he is capable of rendering. On the other hand the minimum price fixed by the

Board actually interferes with the liberty of the efficient and highly skilled barber to contract with his patron for the rendition of a much needed service in the matter of beard cutting, hair trimming and facial massage.

So the question is reduced to the narrow limitations of the State-wide necessity of fixing a minimum price for barber service in the interest of public health and welfare or the preservation of a trade which may be said to constitute a paramount industry of the State. We perceive no elements in the trade which make it an industry of paramount importance to the State peculiarly different from those contained in other like businesses where the element of personal service is sought from skillful practitioners.

The registered barber may by ignoring the order of the Board under Chapter 16789, *supra,* be convicted of a crime for selling his own service because according to the order of the Board such act creates a temporary emergency in that the service is rendered too cheaply. Such a doctrine involves pernicious consequences and as was said in *Ex Parte* Milligan, 4 Wall. (U. S.) 2, 18 L. Ed. 281, to hold that any of the provisions of the Constitution may be suspended during a so-called emergency announces a doctrine leading directly to despotism. If liberty or property or right to contract may be struck down because in the view of a committee of three constituting a Board of Barbers, prices charged by some barbers in that trade produce difficult circumstances for others in the trade and their families, then constitutional guaranties may be set at naught by less than the "voices of an impatient majority"; in fact by the fiat of a committee which may be motivated not by consideration of the general welfare, but possibly by the desire to set up a kind of monopoly in the barber trade.

The provisions of Section 12 of the Act not only em-

power the Board to fix minimum prices in different "strategic" points in the State, but the Board may "vary or refix the minimum prices" throughout the State or in any county whenever the Board decides the prices fixed "are insufficient to answer the emergency in that the prices so fixed are not providing the average barber with a sufficient income to properly maintain and nourish his family."

It is inconceivable that such power should be attempted to be conferred upon an administrative body. Its order becomes a local law for the punishment of a so-called misdemeanor, which by the Committee's fiat may be an offense in one County but not in another, and may be an offense today and not tomorrow according to the action of the Board.

The obvious purpose of the Act was to enable the Board of Barber Examiners to set up a code for the government of the trade without any approval by any department and without setting up any standards aside from the opinion of the Board as to what is necessary to secure to the "average barber" and his family suitable nourishment and maintenance. The analogy is almost perfect with the case of Schechter v. U. S. 79 L. Ed. 1570, 295 U. S. 495. See also State v. Fowler, 94 Fla. 752, 114 South. Rep. 435; State v. Duval County, 76 Fla. 180, 79 South. Rep. 692, relating to the delegation of legislative power.

· No emergency exists to justify such an extraordinary bit of legislation even measured by the alleged findings of fact by the legislative department and recited in the first section of the Act. The conclusion attempted to be reached that the legislation is justified in the interest of public welfare, health and morals has been shown to rest upon one supposition piled upon another which coincides with no known facts or other probable hypotheses. Such a regulation

could be justified only upon the fact that the barber trade is a paramount industry of the State intimately connected with its welfare so that the State may through an agency such as the Board of Barber Examiners prescribe prices for the services to be rendered by each barber.

Upon that sort of theory the Nebbia case, *supra,* was decided, but the Supreme Court of the United States has many times approved the view that the State has no such power in cases of private business not so closely connected with the public welfare. See U. S. v. L. Cohen Grocery Co., 255 U. S. 81, 41 Sup. Ct. Rep. 298; Adkins v. Children's Hospital, 361 U. S. 525, 43 Sup. Ct. Rep. 394; Wolff Packing Co., v. Court of Industrial Relations, 262 U. S. 522, 43 Sup. Ct. Rep. 630; Williams v. Standard Oil Co., 278 U. S. 235, 49 Sup. Ct. Rep. 115; New State Ice Co. v. Liebmann, *supra.*

What this legislation undertakes is not regulation, but management, control, dictation. The Legislature may not by its fiat convert a private business into a public utility. In the language of Mr. Justice McREYNOLDS dissenting in the Nebbia case, *supra,* "if it be now ruled that one dedicates his property to public use whenever he embarks on an enterprise which the Legislature may think it desirable to bring under control, this is but to declare that rights guaranteed by the Constitution exist only so long as supposed public interest does not require their extinction. To adopt such a view, of course, would put an end to liberty under the Constitution.

Another supposition is that for the average barber to properly maintain and nourish himself and family according to the standards which may commend themselves to the views of the members of the Board is a matter affecting the general welfare of all the people of the State so that the

invocation of the police power is essential to preserve it by securing to the favored class the necessities, comforts and conveniences essential to the Board's idea of proper maintenance and nourishment.

Still another supposition is that the demoralization of the trade is brought about by a "cut throat" practice indulged in by the "stronger members" of the profession in order to eliminate the weaker members, and by an effort on the part of the latter to meet the exigencies of the economic depression.

Reduced to its last analysis the thought underlying the Act seems to be not that the barber trade is a paramount industry affecting the general welfare, but that the prosperity of the barber class sufficient to maintain the average barber and his family "properly" is a sufficeint reason for the exercise by the State of the power of direction, control and management of the barber business in the interest of health, and morals. And further, that the liberty of contract enjoyed by every barber engaged in his vocation is used by him or likely to be so used by him as to imperil the business and jeopardize the public health, morals and general welfare.

We find in none of the cases support, directly or indirectly, of such a notion of democratic government or constitutional liberty.

We are therefore of the opinion that the return is insufficient and that the peremptory writ of mandamus should be issued.

Peremptory writ granted.

WHITFIELD, C. J., and DAVIS, J., concur.

BROWN, J., concurs specially.

TERRELL and BUFORD, J. J., dissent.

BROWN, J. (concurring specially).—If the general ques-

tion of the power of the Legislature to regulate prices is to be settled once and for all by the decision in this case, it be hard to overestimate the importance of the question presented. But I think the question here presented is much narrower in its scope than the question discussed in the able opinions of Mr. Presiding Justice ELLIS and Mr. Justice BUFORD.

Section 12 of Chapter 16799 shows that the regulatory board set up in the Act is required to fix mimimum prices "generally throughout the State of Florida or in any county thereof." This section also provides that, "The board shall have authority to fix a mimimum price of a barber's work in each county in the State of Florida, or may in its discretion fix a uniform minimum price for barber work to run throughout the State of Florida."

The Court judicially knows that conditions vary so much in different portions of the State and in different portions of the same county or city as to make it impossible to fix a fair reasonable minimum price for barber work on the basis required by the section of the statute quoted from.

The pleadings in this case state that the board of barber examiners, after investigating conditions, made an order fixing minimum prices to be charged for barbering services in Duval County, failing, however, to state what those prices were. But in the brief filed in behalf of the respondents and on the oral argument it was conceded by counsel for both sides that such order fixed the minimum price of haircuts at 40 cents, shaves 20 cents, plain shampoos 40 cents, medicated shampoos 75 cents, and other prices for the various kinds of barber services. The price so fixed for the entire county of Duval may have been entirely reasonable as minimum prices to be charged in the expensively equipped and gleaming white barber shops located in the central

business district of Jacksonville, where rents are high and where the patrons of the shops so located are able to pay such prices, and probably even more; whereas those prices would be unreasonably high to be charged by the barbers in the poorer sections of the city where rents are much lower, and this would probably be likewise the case in the smaller towns of Duval county.

This thought is further illustrated by a statement made in the oral argument by counsel for the relator. In the course of his argument, he stated in substance that the relator was a colored man who had been in the barber business for many years and was a thoroughly competent barber; that his shop was located in a section of the city inhabited almost entirely by people of small means, most of whom were poor and not able to pay the minimum price thus fixed by the barber board for the entire county, and that it would practically destroy the relator's business and work a hardship upon his patrons if he were compelled to charge such prices.

The impossibility of fixing fair and reasonable minimum prices for barber work on a flat rate basis for an entire county would of course apply with greater force to an attempt to fix such prices for the entire state. Therefore, no matter how laudable the purpose of the statute, this section of the statute, in the form enacted by the Legislature, is incapable of being put into practical operation without denying to relator and many other barbers in the state the equal protection of the laws.

The field within which the police powers of the state may be exercised without unduly encroaching upon those fundamental personal and property rights of the individual citizen which are protected by both our state and national Constitutions, should be marked out and established, not by

attempt to lay down any general rule which would be applicable in all cases, and certainly not by any speculative theorizing, but the line should be drawn step by step by the careful and practical decision of specific cases as they arise. It is important therefore that the court go no further than is absolutely necessary in each particular case. By the gradual process of judicial inclusion and exclusion, the courts can much better apply the fundamental law to legislative Acts designed to regulate business, labor and agriculture, and the professions, by considering each case on its merits as it arises, fairly and impartially facing the facts, the realities, of each situation as it is presented, than by any intensive effort to lay down general rules to govern all future cases that may come up.

The great difficulty of drawing the line in cases of this kind is illustrated by the decisions of the Supreme Court of the United States. Thus, in Holden v. Hardy, 169 U. S. 366, 42 L. Ed. 780, decided in 1898, the Supreme Court of the United States held that a state statute limiting the period of emplyoment of workmen in underground mines, or in the smelting reduction of ores, to eight hours per day, and making its violation a misdemeanor, was a valid exercise of the police power of the state. It was also held in that case that the fact that both parties are of full age and competent to contract does not necessarily deprive the state of the power to interfere, where the parties do not stand upon an equal footing, or where the public health demands that one party to the contract shall be protected against himself. Yet, later on, in the case of Lochner v. New York, 198 U. S. 45, 48 L. Ed. 937, the same court held that a New York statute limiting employment in bakeries to sixty hours a week and ten hours a day, was an arbitrary interference with the freedom of contract guaranteed by the 14th amendment,

and was not a valid exercise of the police power to protect the public health, safety, morals, or general welfare. Justices HARLAN, WHITE, DAY and HOLMES dissented. The dissenting opinion of Mr. Justice HOLMES in that case has been frequently quoted. The reading of the very able majority and minority opinions in that case shows how hard it is to draw the line. That opinion was rendered in 1905. In 1917, the same court decided the case of Bunting v. Oregon, 243 U. S. 426, 61 L. Ed. 830, wherein it was held that an Oregon statute, purporting to have been enacted as a health measure, and which prohibited any person from being employed in any mill, factory or manufacturing establishment in that state more than ten hours in any one day, except watchmen and employees when engaged in making necessary repairs, or in cases of emergency where life or property was in imminent danger, with a proviso for extra pay for voluntary overtime work, was a valid exercise of the police power, and that the limitation to employees in mills, factories, or manufacturing establishments was not an unconstitutional limitation. Three of the Justices dissented in that case without opinion. The decision in that case is apparently in conflict with the decision in the Lochner case above referred to. Indeed, the decision of that eminent tribunal in the Lochner case, *supra,* and in Coppage v. Kansas, 236 U. S. 1, 59 L. Ed. 441, and in Adkins v. Children's Hospital, 261 U. S. 525, 67 L. Ed. 785, have been the subject of much discussion and considerable criticism. In the case last cited, Adkins v. Children's Hospital, an Act of Congress, generally applicable to all occupations within the District of Columbua, giving a regularly constituted board the power to fix for women a minimum wage, sufficient in its opinion to supply the necessary cost of living and maintain the women in good health and protect their morals, the

violation of which subjected employers to a penalty, was held invalid, as being in conflict with the due process clause of the Federal Constitution. This decision was rendered in 1923. The dissenting opinions of Mr. Chief Justice TAFT and Mr. Justice HOLMES are very strong, and no doubt come nearer stating the law as it exists today than did the majority opinion by Mr. Justice SUTHERLAND. Mr. Chief Justice TAFT contended that the decision of the majority was in conflict with Bunting v. Oregon, *supra,* and Muller v. Oregon, 208 U. S. 412, 52 L. Ed. 551, which latter case sustained the validity of a limit on maximum hours of labor for women. The dissenting opinion of Mr. Justice HOLMES is well worth reading in connection with the case now before us. It strongly supports the position taken by Mr. Justice BUFORD.

In the case of Tyson & Bro. v. Banton, 273 U. S. 418, 71 L. Ed. 718, the court held that in order to constiutionally justify the fixing of prices, the business must be one which has been devoted to the public use, and its use in effect granted to the public. In that case Justices HOLMES, BRANDIES, STONE and SANFORD dissented. In his dissenting opinion, Mr. Justice STONE said:

"The attitude in which we should approach new problems in the field of price regulation was indicated in German Alliance Ins. Co. v. Kansas, 233 U. S. 389, 409, 58 L. Ed. 1011, 1020, L. R. A. 19150, 1189, 34 Sup. Ct. Rep. 612: 'Against that conservatism of the mind, which puts to question every new act of regulating legislation and regards the legislation invalid or dangerous until it has become familiar, government—state and national— has pressed on in the general welfare; and our reports are full of cases where, in instance after instance the exercise of the regulation was resisted and yet sustained against attacks asserted to be

justified by the Constitution of the United States. The dread of the moment having passed, no one is now heard to say that rights were restrained or constitutional guaranties impaired.' Again, in sustaining the constitutionality of a zoning ordinance under the 14th Amendment, this Court has recently said: 'Regulations, the wisdom, necessity and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive.' Euclid v. Ambler Realty Co., 272 U. S. 365, ante, 303."

Finally, in the recent New York Milk case, Nebbia v. New York, cited in both the opinions of Mr. Presiding Justice ELLIS and Mr. Justice BUFORD, the Court, as we have seen, abandoned its previous views that price fixing could not be employed as a means of public regulation of industry, unless those industries were in effect public utilities.

In the opinion of Mr. Presiding Justice ELLIS, as I understand it, it is intimated that the learned Justice might uphold the validity of Section 12 of this statute if it dealt with a "paramount" industry. Whether the sale of milk in a state like New York, which contains America's largest city, might be deemed a paramount industry is perhaps a somewhat debatable question. But undoubtedly, the Supreme Court held that the milk business was of such vital importance to the people of the State of New York as to justify the Legislature in fixing minimum and maximum prices for that very necessary product, in order to remedy conditions of over-supply, destructive competition and low prices. It was somewhat on this basis that this Court in the case of Earle v. Dade County, 92 Fla. 432, 109 Sou. 331, upheld an Act authorizing a county to acquire property and to erect thereon the necessary structures for the purpose of con-

ducting fairs and agricultural exhibitions for the enhancement of the agricultural interests of the county, and to issue bonds for that purpose, and to levy the necessary taxes to pay such bonds, as not being in conflict with Section 5 of Article IX of our Constitution. The stated purpose was held a legitimate public purpose, and a "county purpose" within the meaning of such constitutional provision limiting county taxation to county purposes. There we had an Act which in effect taxed all of the taxpayers of Dade County, without regard to occupation, for the purpose of promoting the interest of a particular class, those engaged in agriculture, which was regarded as a "basic industry." In the opinion in that case it was said:

"It must be admitted that the policy of promoting the progress and welfare of the great basic agricultural industry of our country, upon which the prosperity and welfare of all classes depends, by the establishment and maintenance of agricultural departments, in both the state and national governments, has long since became a well established public policy. While possibly this policy may not be rested upon an absolute public necessity, it may very probably be justly based upon the vital interest of the public in the proper functioning of the agricultural interests."

The mere fact that the statute now under consideration deals with a comparatively small business or occupation, there being only some 3,700 active registered barbers in the State, does not negative the fact that it is a business which has a very real relation to the public health and I do not think that there is any doubt that the Legislature has the power to regulate such a business. In the Act of 1931, various provisions were incorporated which were designed to raise the standard of barbering work in this State, even to the extent of providing certain educational qualifications

for apprentices, and examination before registration, and schools of barbering wherein the scientific functions of barbering, physiology, hygiene, elementary chemistry relating to sterilization and antiseptic massage and manipulation of the muscles of the face, neck, scalp, etc., should be taught. Each applicant for a certificate of registration was required to pass a satisfactory examination. The validity of this Act, Chapter 14650, has been upheld against such attacks as have heretofore been made, and I am inclined to think that both that statute and the one now under review here were and are in their general features within the power of the Legislature to adopt.

The constitutional provision regarding the equal protection of the law does not prohibit legislation which is limited either in the object to which it is directed or by the territory within which it is to operate. It merely requires that all persons subject to such legislation shall be treated alike, under like circumstances and conditions, both in privileges conferred and liabilities imposed. It is not infringed by legislation which applies only to those persons falling within a specific class, if it applies alike to all persons within such class, and reasonable grounds exist for making a distinction between those who fall within such class and those who do not. Cooley's Constitutional Limitation, page 824-25; DiLustro v. Penton, 106 Fla. 198, 142 So. 898.

While freely admitting that it is difficult to construe or apply to new circumstances as they arise Section 1 of the Declaration of Rights in our Constitution and the due process and equal protection clauses of the Federal Constitution, and while I am inclined to agree in the main with the reasoning contained in Mr. Justice BUFORD's opinion, I am clearly of the opinion that Section 12 of Chapter 16799, as it appears before us in this Act, is in conflict with those

provisions of the Constitution, state and national, because of the arbitrary county wide and state wide features of said price-fixing section, as discussed in the beginning of this opinion. I therefore concur in the granting of the peremptory writ.

BUFORD, J. (dissenting).—I agree that established legal principles are as stated in the very able opinion prepared in this case by Mr. Presiding Justice ELLIS, for the Court, but I cannot concur with the conclusion reached by the reasoning in that opinion when those legal principles are applied to the facts involved here.

It is conceded that the conducting of the barbers' trade or profession is an activity affected with public interest so that the Legislature in the exercise of lawful police power may impose on those engaged therein reasonable regulations and require them to meet certain standards of training and efficiency, of physical condition and of sanitary conditions and appliances to safeguard the public health and, therefore, facilitate public welfare. The barbers' is among the oldest of the honorable professions involving the necessity of personal physical contact between the skilled and specially trained operator on the one hand and large numbers of individual members of society constituting the public on the other. The barber is not only an important factor, but he is a necessary adjunct to social welfare and personal hygiene and comfort.

. The practice of the barbers' profession is so essentially associated with personal contact that the transmission of disease from operator to the person operated on, and vice-versa, as well as from one being operated on to another in like position, is a constant hazard. It is indeed hard to reach the conclusion that any commercial activity is any

more fully and clearly affected with public interest than is that of the barber.

Realizing the above stated condition to be true, legislatures in many states have imposed burdensome regulations on those engaged in practicing the barbers' profession in serving the public for compensation. The courts have uniformly upheld such legislative power. Florida has adopted such legislative Acts and the Court has sustained such Acts as being within the reasonable exercise of police power. See DiLustro v. Penton, 106 Fla. 198, 142 Sou. 898; State, *ex rel.* Garrison, v. Reeve, 104 Fla. 196, 159 Sou. 817.

May the Legislature impose heavy and expensive burdens on those engaged in a business greatly affected with the public interest, which burdens are imposed for the protection of the public and at the same time be denied the power to protect those on whom the burden is placed from unfair and ruinous competition and destructive methods. I think not.

The barber is not a private contractor. He is a public contractor. He takes all who come to his chair in apparently good condition, that is, all apparently free from filth, vermin or infectious or contagious diseases, just as a common carrier takes all freight tendered in apparently good condition. He takes those who in apparent good condition come for his services in the turn in which they come. Perhaps nowhere is the "first come, first served" rule more universally and rigidly enforced than in the barber shop.

The conducting of the barbers' profession, I maintain, is an essential activity incident to the welfare of every community in Florida. Some may take issue with this statement on the theory that one does not necessarily require the services of a barber. The answer is that such service is required by everyone who is to maintain a position of re-

spect in the community. It may not be necessary for one
to use the services of a common barber, but it is essential
for the public to do so. It may not be necessary for one
to use milk. Even substitutes which never had any connec-
tion with a cow are used and often recommended in lieu of
milk. Nevertheless, in this country, milk is judicially and
legislatively recognized as an essential to public welfare
and the industry of producing and distributing milk is both
regulated and protected.

The provisions of the Act are sufficiently set forth in the
opinion by Mr. Presiding Justice ELLIS to make it needless
to repeat them here.

The feature of the Act which brings it in conflict with
organic law as is contended by the relator is that which pur-
ports to authorize the State Board of Barber Examiners to
fix minimum prices for barber work in the several counties
of the State of Florida.

Section 12 of the Act, Chapter 16799, Acts of 1935, pro-
vides a reasonable and adequate method by which the Board
as a fact-finding body may arrive at and determine the
amount of the minimum prices which in fairness and good
conscience should be charged and received for barber work
in each of the several counties so that an average barber
practicing his profession in that locality could reasonably
be expected to earn enough to pay the expense incident to
conducting that business in compliance with the law and to
provide a sufficient wage to support him and his lawful de-
pendents.

There is no question in this case by which the reasonable-
ness of the price fixed by the Board for barber work in
Duval County is challenged.

It is not contended that the Board has acted arbitrarily
and without substantial evidence to support its findings.

'The challenge is that the Legislature was, and is, without power to enact and make effective such statutory provisions as those contained in Section 12 of the Act, either based on the legislative finding of the existence of an emergency or otherwise.

The legislative finding and declaration was in part as follows:

"Section 1. LEGISLATIVE FINDING: STATEMENT OF POLICY:—This Act is enacted in the exercise of the police power of this State and its purposes generally are to protect the public welfare, public health, public safety and public morals. It is hereby declared that unfair, unjust, destructive, demoralizing and uneconomic trading practices have been and are now being carried on in the operation of barber shops in the State of Florida, and that unfair competition exists between the individual barbers of this State to the extent that prices have been reduced by such unfair competition to the point where it is impossible for an average barber, although working regularly, to support and maintain in a modest manner, a family. That such conditions constitute a menace to the health, welfare and reasonable comfort of the inhabitants of this State. That in order to protect the well-being of our citizens and to protect the health of the families and other dependents of the barbers of the State of Florida, and the respective patrons of the barbers of the State of Florida, and promote the public welfare and due to the personal touch and contacts manifested and exercised in the barber business, and the subsequent necessity for well nourished, strong and healthy persons to engage in the barber business, the barber profession is hereby declared to be a business affecting the public health, public interest, public safety and public morals."

The petitioner contends that the State Board of Barber

Examiners has no lawful right to decline to issue to him a permit to engage in the business or profession in which he will be allowed to do barber work for the public because he has violated the rule of the Board as promulgated in regard to the fixing of minimum prices to be charged in Duval County and that he may lawfully disregard that rule because to be compelled to comply with it is to abrogate his right to contract which abrogation violates Section 1 of the Declaration of Rights of our State Constitution and the XIV, Amendment to the Federal Constitution. The Constitution not only guarantees to the citizen the right to live, but it imposes the duty on him to so live that others may also live. It enunciates the doctrine of "live and let live."

Neither Section 1 of the Declaration of Rights or the XIV Amendment to the Federal Constitution guarantees to any citizen the right to pursue his own life, the acquisition of property, the enjoyment of liberty or the quest for happiness at the cost of the sacrifice of like rights vested in other members of society, or when in such pursuit he jeopardizes the public health, the public morals or the public welfare. A citizen has the right under the Constitution to acquire property, but no informed person will contend that one has the right to acquire all the property and thereby pauperize all other citizens. To determine the limit by the amount of property which may be owned or controlled by any individual or group may become a necessary legislative activity. We may safely say that the rights guaranteed under the constitutional provisions above referred to are limited to that sphere wherein the exercise thereof by one citizen or group of citizens will not abrogate or make impossible the exercise of like or other constitutional rights by other citizens or groups of citizens.

Upon the construction above stated must rest, to a great

extent, the foundation of judicial decisions which uphold the power of the Legislature to fix rates to be applied to and by common carriers and other public utilities and the power to establish and enforce minimum prices on such commodities as milk, all of which legislative enactments abridge the individual's right to contract with regard to the affected commodities.

So the power unquestionably exists in the Legislature to enact law which may effectually limit or abridge, or even control, the right to contract and which may write the terms of the contract which the parties are bound to observe and abide. See authorities cited by Mr. Presiding Justice ELLIS supporting the statement in his opinion, "That freedom, however, is not an absolute, but a qualified right, and is, therefore, subject to reasonable restraint in the interest of the public welfare." See also Everglades Sugar & Land Co. v. Bryan, 81 Fla. 75, 87 Sou. 68; State, *ex rel.* Davis, v. Rose, 97 Fla. 710, 122 Sou. 225; Whitaker v. Parsons, 80 Fla. 352, 86 Sou. 247.

In the case of Nebbia v. New York, 291 U. S. 502, 54 Sup. Ct. Rep. 505, the Supreme Court of the United States, speaking through Mr. Justice ROBERTS, said:

"Under our form of government the use of property and the making of contracts are normally matters of private and not public concern. The general rule is that both shall be free of governmental interference. But neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest. As Chief Justice MARSHALL said, speaking specifically of inspection laws, such laws form 'a portion of

that immense mass of legislation which embraces everything within the territory of a State * * * all which can be most advantageously exercised by the States themselves. Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a State * * * are component parts of this mass.' "

Justice Barber said for this Court:

"* * * it is not only the right, but the bounden and solemn duty of a State, to advance the safety, happiness and prosperity of its people, and to provide for its general welfare, by any and every Act of legislation, which it may deem to be conducive to those ends; where the power over the particular subject, or the manner of its exercise, is not surrendered or restrained, in the manner just stated. That all those powers which relate to merely municipal legislation, or what may, perhaps, more properly be called *internal police,* are not thus surrendered or restrained; and that, consequently, in relation to these, the authority of a State is complete, unqualified and exclusive."

And Chief Justice TANEY said upon the same subject:

"But what are the police powers of a State? They are nothing more or less than the powers of government inherent in every sovereignty to the extent of its dominions. And whether a State possesses a quarantine law, or a law to punish offenses, or to establish courts of justice, or requiring certain instruments to be recorded, or to regulate commerce within its own limits, in every case it exercises the same powers; that is to say, the power of sovereignty, the power to govern man and things within the limits of its dominion. It is by virtue of this power that it legislates; and its authority to make regulations of commerce is as absolute as its power to pass health laws, except inso-

far as it has been restricted by the Constitution of the United States."

· "Thus has this Court from the early days affirmed that the power to promote the general welfare is inherent in government. Touching the matters committed to it by the Constitution, the United States possesses the power, as do the States in their sovereign capacity touching all subjects jurisdiction of which is not surrendered to the Federal Government, as shown by the quotations above given. These correlative rights, that of the citizen to exercise exclusive dominion over property and freely to contract about his affairs, and that of the State to regulate the use of property and the conduct of business, are always in collision. No exercise of the private right can be imagined which will not in some respect, however slight, affect the public; no exercise of the legislative prerogative to regulate the conduct of the citizen which will not to some extent abridge his liberty or affect his property. But subject only to constitutional restraint the private right must yield to the public need."

And further, in the same opinion, it is said:

"Legislation concerning sales of goods, and incidentally affecting prices, has repeatedly been held valid. In this class fall laws forbidding unfair competition by the charging of lower prices in one locality than those exacted in another, by giving trade inducements to purchasers, and by other forms of private discrimination. The public policy with respect to free competition has engendered State and Federal statutes prohibiting monopolies, which have been upheld. On the other hand, where the policy of the State dictated that a monopoly should be granted, statutes having that effect have been held inoffensive to the constitutional guaranties. However, the State or a municipality may it-

self enter into business in competition with private proprietors, and thus effectively although indirectly control the prices charged by them."

And it is also said:

"But we are told that because the law essays to control prices it denies due process. Notwithstanding the admitted power to correct existing economic ills by appropriate regulation of business, even though an indirect result may be a restriction of the freedom of contract or a modification of charges for services or the price of commodities, the appellant urges that direct fixation of prices is a type of regulation absolutely forbidden. His position is that the Fourteenth Amendment requires us to hold the challenged statute void for this reason alone. The argument runs that the public control of rates or prices is *per se* unreasonable and unconstitutional, save as applied to businesses affected with a public interest; that a business so affected is one in which the public itself might appropriately undertake, or one whose owner relies on a public grant or franchise for the right to conduct the business, or in which he is bound to serve all who apply; in short, such as is commonly called a public utility, or a business in its nature a monopoly. The milk industry, it is said, possesses none of these characteristics, and, therefore, not being affected with a public interest, its charges may not be controlled by the State. Upon the soundness of this contention the appellant's case against the statute depends."

Then we come to the statement of the principles of law which appear to me to govern the case at bar, when we find in that opinion the following language:

"We may as well say at once that the dairy industry is not, in the accepted sense of the phrase a public utility. We think the appellant is also right in asserting that there

is in this case no suggestion of any monopoly or monopolistic practice. It goes without saying that those engaged · in the business are in no way dependent upon public grants or franchises for the privilege of conducting their activities. But if, as must be conceded, the industry is subject to regulation in the public interest, what constitutional principle bars the State from correcting existing maladjustments by legislation touching prices? We think there is no such principle. The due process clause makes no mention of sales or of prices any more than it speaks of business or contracts or buildings or other incidents of property. The thought seems nevertheless to have persisted that there is something peculiarly sacrosanct about the price one may charge for what he makes or sells, and that, however able to regulate other elements of manufacture or trade, with incidental effect upon prices, the State is incapable of directly controlling the price itself. This view was negatived many years ago. Munn v. Illinois, 94 U. S. 113. The appellant's claim is, however, that this Court, in their sustaining a statutory prescription of charges for storage by the proprietors of a grain elevator, limited permissible legislation of that type to businesses affected with a public interest, and he says no business is so affected except it have one or more of the characteristics he enumerates. But this is a misconception. Munn and Scott held no franchise from the State. They owned the property upon which their elevator was situated and conducted their business as private citizens. No doubt they felt at liberty to deal with whom they pleased and on such terms as they might deem just to themselves. Their enterprise could not fairly be called a monopoly, although it was referred to in the decision as a 'virtual monopoly.' This meant only that their elevator was strategically situated and that a large portion of the public

found it highly inconvenient to deal with others. This Court concluded the circumstances justified the legislation as an exercise of the governmental right to control the business in the public interest; that is, as an exercise of police power. It is true that the Court cited a statement from Lord Hale's De Portibus Maris, to the effect that when private property is 'affected with a public interest, it ceases to be *juris privati* only'; but the Court proceeded at once to define what it understood by the expression, saying: 'Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large.' (p. 126.) Thus understood, 'affected with a public interest' is the equivalent of 'subject to the exercise of the police power'; and it is plain that nothing more was intended by the expression. The Court had been at pains to define that power (pp. 124, 125) ending its discussion in these words:

" 'From this it is apparent that, down to the time of the adoption of the Fourteenth Amendment, it was not supposed that statutes regulating the use, or even the price of the use, of private property necessarily deprived an owner of his property without due process of law. Under some circumstances they may, but not under all. The amendment does not change the law in this particular; it simply prevents the States from doing that which will operate as such a deprivation.'

"In the further discussion of the principle it is said that when one devotes his property to a use 'in which the public has an interest' he in effect 'grants to the public an interest in that use' and must submit to be controlled for the common good. The conclusion is that if Munn and Scott wished to avoid having their business regulated they should not have

embarked their property in an industry which is subject to regulation in the public interest."

Further quotation from that opinion need not be indulged here. The holding definitely was: that if the industry is subject to regulation in the public interest, there is no constitutional principle which bars the State from correcting existing maladjustments by legislation touching prices. So I think the conclusion logically follows that if the Legislature has the power to regulate the practice of the barbers' profession and to fix and establish standards of fitness to engage in the profession and to fix and establish standards of sanitation to be observed in the performance of barbers' work under the exercise of police power, then the Legislature may also through the medium of a fact-finding board, determine and fix minimum prices which may be charged by those engaged in the barbers' profession within designated areas, so as the public may be provided with the services of skilled barbers, free from contagious disease, conducting their barbers' work under sanitary conditions, complying with standards in this regard fixed by law, and which will at the same time afford the average skilled barber so engaged a fair return on his investments and his labor.

As is pointed out by Mr. Justice ROBERTS in the case of Nebbia v. New York, *supra,* this is just what has been upheld as being within the legislative power in the numerous cases referred to in that opinion. It also appears to me that the statute of New York, the price-fixing feature of which was under attack in the case just referred to, was upheld not because the milk industry was affected with *paramount* public interest, but it was upheld because it regulated in this regard an industry which was *so affected with* public interest *as to be subject to legislative control* under the police power, and, it being admittedly subject to control under

police power, that control could, in part, be exercised by price fixing. That the Legislature has not attempted by price-fixing to protect the nurse, the physician, the dentist or the lawyer from pauperism resulting from price cutting, or to protect the public from a mass effort on the part of those engaged in one or the other of those professions to over-charge and thereby place the service rendered by those engaged in such profession beyond the reach of the average citizen is probably not because of lack of legislative power to render such protection, but may be because the need for such protection has not become evident.

There may be some invalid provisions in the Act which are not here involved and which the relator is not in a position to question. With such provisions we are not now concerned.

I think there is much immaterial matter stated in Section 1 of the Act involved. The emergency which will warrant such legislative action is merely the existence of a condition the result of which will work great hardship and injustice upon those rendering the service affected with public interest or upon those entitled to receive and have the benefit of the service rendered. Whether or not such a condition exists is first to be determined by the Legislature. The legislative determination in this regard may be reviewed by the courts on proper presentation, but on such review the question to be determined is one of fact and not one challenging legislative power. I find no reason, either in law or logic, why the Legislature may not protect the earning power of human hands engaged in a service materially affected with public interest such as that of the barber, with the same sanctity which it may, and does, protect by fixing rates, the earning power of dollars invested in railroads and other utilities which render service affected with public in-

446

terest, when it has imposed burdensome legislative regulations on both under its lawful police power solely because of the fact that the field of activity of each is affected with the public interest.

I think the opinion and judgment in the case of Schecter v. United States, 79 U. S., Law Ed. 888, has no application to the case at bar because in that case the Court held the Act under consideration invalid because the enactment thereof was beyond the power of Cognress.

For the reasons stated, I think the alternative writ should be quashed.

TERRELL, J., concurs in conclusion.