GEORGE H. EARLE, JR., *Appellant,* v. DADE COUNTY, FLORIDA, *Appellee.*

Division A.

Opinion Filed July 29, 1926.

1. Under the provisions of Chapter 9418, of Acts of 1923, no limitation is placed upon the amount of the tax which the board of county commissioners are authorized to levy to pay the principal and interest on bonds issued under Section 3 of said act.

2. An Act authorizing a county to acquire and hold property and erect thereon the necessary structures for the purpose of conducting fairs and agricultural exhibitions for the enhancement of the agricultural interests of the county, and to issue bonds and levy and collect taxes for such purpose, is not in conflict with Section 5 of Art. IX of the Constitution, the purpose stated being a legitimate county purpose within the meaning of such constitutional provision, limiting county taxation to county purposes.

An Appeal from the Circuit Court for Dade County; H. F. Atkinson, Judge.

Affirmed.

*Evans & Mershon,* for Appellant;

*A. B. & C. C. Small,* for Appellee.

BROWN, C. J.—This is a proceeding brought under Section 3296, *et seq.,* of the Revised General Statutes for the validation of an issue of bonds by the County of Dade for the purpose of erecting public fair buildings in said county by authority of a special act of the Legislature, Chapter 9418 of the Acts of 1923. Plaintiff in error intervened in said proceedings, and from the final decree validating said bonds, has taken this appeal.

Only two questions are presented and argued. (1) Whether, under said special act, the Board of County Commissioners could issue and sell bonds for the purposes stated in the act in such amounts that the tax necessary to be levied for the retirement and payment of interest on said bonds, would at any time exceed two mills on the dollar of the taxable property within the county. (2) Whether the purpose for which the bonds were issued was a county purpose, as to which the Legislature could authorize the county to act.

It not having been made to appear that the amount of the proposed bond issue, $100,000.00, was so large that the tax which would have to be levied for the payment of the principal and interest of such bonds would exceed the two mills provided by the act, it is doubtful if any basis has been laid for the proper presentation of the first question—even if it be admitted that the provision of the act with regard to the two mill tax has reference to retirement of

the bond issue. But in view of its importance, we will review the question briefly.

Section 1 of the act authorizes the *acquirement and holding of real property* within the county for fair and fairground purposes, and for the *erection and construction* upon such property for such purposes *of building and other structures necessary* or desirable, for the purpose *inter alia* of conducting fairs, and agricultural exhibitions for the furthering and enhancement of the agricultural interests of said county. (Italics ours).

Section 2 gives the Board of County Commissioners the power to levy upon all property, real and personal, subject to taxation in Dade County, an annual tax, *in addition to all other taxes*, not to exceed two mills on the dollar, for the purposes of and to be expended in the carrying out "of the foregoing provisions." (Italics ours).

Section 3 authorizes said board to issue and sell from time to time bonds of the county for the purpose of raising the necessary funds for the carrying out of the provisions of this act, provided such issue shall be approved by a majority of the qualified voters of the county voting at an election to be held for that purpose, and then follows this language: "And it shall be the duty of said Board of County Commissioners from time to time, upon the issue of any such bonds, *to levy and cause to be collected a tax* upon all the taxable property in said County of Dade *sufficient to pay the interest upon the same as it shall become due, and to pay the annual installments of such bonds from year to year as they mature.*" (Italics ours).

Section 4 provides that the board shall not expend monies nor incur indebtedness in the *operation* or *conduct* of such fair and fair-grounds aggregating in any one year a sum in excess of the amount which may be raised during such year by the two mill tax.

It appears from this summary of the act that no limit is placed upon the millage which it may be necessary to levy to pay the principal and interest of the bonds. The language of Section 3 is clear and unequivocal, and leads to no other conclusion. The limitation of taxation to two mills on the dollar, in Section 2, evidently refers to the purposes incorporated in Section 1, and Section 4 seems to have been added to make it clear that the two mill tax limit should apply also to the expense of operation of such fair and fair-grounds. But when it comes to providing for the levy of taxes to take care of the bonds issued under Section 3, it seems to have been the intent of the act that the Board of County Commissioners should have the power to levy whatever amount might be required in order to be "sufficient" to pay off the principal and interest of such bonds. The people are given the power at the polls to limit the amount of the bond issue as they see fit, but it was evidently the purpose of the act not to fetter or limit the County Commissioners in discharging the duty of levying such tax as might be necessary to pay the debt so authorized.

As to the second question, whether the purpose for which the bonds were issued is a county purpose under Section 5, Article IX of the Constitution, counsel for both parties confess themselves unable to cite any Florida case directly in point. Counties in this State have been authorized under general and special statutes to levy taxes and issue bonds for the erection of court houses, jails, armories, poor houses and other similar essential county buildings, and to deepen the channels and improve the port facilities of navigable waters lying within or adjacent to the boundaries of such counties, to build bridges, construct roads, and aid in the construction of State highways located within the county. See Lewis v. Leon County, 107 So. 146, and cases cited on pages 153, 154. But these cases as to necessary public

buildings and highways deal with what may well be deemed public necessities.

While it might be said that our constitution gives the Legislature broader powers with reference to municipalities than exists with reference to counties, and that what might be allowable as a municipal purpose might not necessarily be allowable as a county purpose, it is at least permissible to refer to instances of the granting and exercise of powers by municipalities which have been held to be legitimate municipal purposes. In this State it has been held that a statute authorizing a city to raise funds by taxation for the maintenance of a public library, is a municipal purpose within the meaning of our constitutional provision. Tampa v. Prince, 63 Fla. 387, 58 So. 542. We also have a general statute authorizing cities and towns to establish and maintain free public libraries and reading rooms. In the case of City of Bradenton v. State, 102 So. 556, — Fla. —, it was intimated that the Legislature might authorize a municipality to establish and maintain a public golf course, but that the authority so to do would not be implied from the general powers vested in the city. The decisions of other States have recognized donations by municipalities to colleges, industrial expositions, and Firemen's Relief Associations, and that municipalities have power to erect public market houses, auditoriums, amusement pavilions and parks, and halls for public assemblies. 3rd McQuillin Munic. Corp., pages 2476 to 2479. But the power of a city to erect an opera house has been denied. Brooks v. Brooklyn, 146 Ia. 136, 124 N. W. 868, 26 L. R. A. (N. S.) 425. Under the power to maintain and improve public parks, cities have been allowed to construct and operate in connection therewith zoological gardens and pavilions for public amusement and convenience. It is a matter of common knowledge that it has long been the custom for private associations to organize and hold county fairs in many of

the agricultural sections of this country, and to acquire property and construct buildings for such purposes, and in addition to exhibitions of farm products and the offering of prizes therefor, to promote the success of the enterprise by amusement and other attractions in connection therewith. The effect of these fairs has no doubt been to stimulate an interest in improved agricultural methods. It may also be true that the public benefits to be derived from such fairs are sufficient to authorize the Legislature to place the expense thereof upon the public rather than upon a few individuals who have the public spirit to promote and organize such enterprises. As to this feature of the act in question, though somewhat paternalistic in its nature, we are not prepared to say that the Legislature has exceeded its powers or come in conflict with any constitutional restriction. This court has held that the Legislature, in exercising its appropriate law-making functions, may determine what is a county purpose, within the meaning of Section 5, Article IX of the Constitution, and the courts are not authorized to render such legislation ineffectual, unless some other provision of the Constitution is violated, or unless the particular enactment can have no practical or legal regulation whatever to any county purpose. Jordan v. Duval County, 68 Fla. 48, 66 So. 298.

But this act is something of an innovation in this State It is a far cry from the construction by a county of such long recognized public necessities as court houses, jails, bridges, roads, etc., to a construction of county fair biuldings and the conduct of county-fairs for the avowed purpose of "fostering and enhancing the agricultural interests of the county." However desirable and beneficial it may be, that the latter smacks of paternalism there can be little doubt. The time was when it was quite generally considered that the sole object and only legtimate end of government, was to protect the citizen in the enjoyment of

life, liberty and property, and that when government went beyond this, it became usurpation and oppression.    It would require a very liberal construction indeed of this somewhat negative but time-honored theory of government to uphold the existence of many of those positive exercises of governmental power, through various departments and bureaus, some of them benevolent and ministrant in their nature, which have crowded our statute books, and increased our taxes, both state and national, during the past few decades. How far the sphere of government may properly be extended in this direction is becoming a serious public question, the political phases of which it is not our purpose to discuss.   It is not the political, but the constitutional, aspects of such questions, which, in concrete cases as they arise, engage and demand the attention of the courts. While not identical, we have here a closely related question—the power of government to tax the people of a county for the purpose of furnishing an agricultural fair or exposition for the promotion of the agricultural interests of such county; at once raising the questions, is this a legitimate public purpose? And is it a county purpose within the meaning of our state constitution? While the question of what is a county purpose may be largely within legislative discretion, yet the exercise of such discretion by the legislature in the premises must accord with other provisions and principles of organic law, and acts passed are subject to judicial review, so that the fundamental law and not arbitrary or unreasonable legislative action shall control to the end that private rights may be conserved as is required by law.

But it must be admitted that the policy of promoting the progress and welfare of the great basic agricultural industry of our country, upon which the prosperity and welfare of all classes depends, by the establishment and main-

tenance of agricultural departments, in both the state and national governments, has long since become a well established public policy. While possibly this policy may not be rested upon an absolute public necessity, it may very probably be justly based upon the vital interest of the public in the proper functioning of the agricultural interests.

Authorities on this subject are quite meager. However, statutes providing for county appropriations for county agents to educate the people in agriculture (State v. Meeker, Ind., 105 N. E. 906), and for the assessment and levy of county taxes to meet the expense of county horticultural inspection (State v. Asotin County, 70 Wash. 634, 140 Pac. 914,) and appropriations for the support and advancement of agricultural societies (Nemaha Fair Association v. Meyers, 44 Kan. 134, 24 Pac. 71), and a statute authorizing county commissioners to contract for agricultural extension work (Bailey v. Van Dyke, Utah, 240 Pac. 454), have been upheld. Also, in Oklahoma, where the validity of such taxation seems to have been assumed without question, a county tax levy for the support of a free county fair was sustained in the following cases: Gulf Pipe Line Co. v. County Treasurer, 110 Okl. 183, 236 Pac. 896; St. Louis, S. F. R. Co. v. Dicky (Okl.)238 Pac. 858; and in case of Simmons v. Stuckey (Okl.) 241 Pac. 124, a statute authorizing certain counties to purchase land and erect live stock and exhibitions buildings, and levy taxes therefor, was also upheld. See 2 C. J., pages 989, 990; 15 C. J. 535; 1921 annotations to C. J. 591. Constitutional provisions in these states are not in all respects similar to ours, which, among other things, prohibits aid by public funds to private corporations. Sections 7 and 10, Article IX, Constitution of 1885. See also Green v. Frazier, 253 U. S. 233, 64 Law Ed. 878.

If the state has the power to establish and operate a

state agricultural department, or provide for a commissioner of agriculture, it would appear that it might also by proper legislation authorize a county, a political subdivision and agency of the state, to promote the local agricultural interests of the county by acquiriing the property and constructing the buildings necessary to the conduct of free public county fairs in the particular county.   Even if it be conceded that the act here in question constitutes an instance of paternalism, not heretofore exercised in this state, this alone does not render it unconstitutional; and it must be remembered that this court would not be authorized to strike down legislative enactments merely because the court might question the wisdom or policy of such laws Nor have we any desire or purpose of questioning the wisdom or policy of this statute.   It is only when acts of the legislature invade some constitutional right of the citizen, or contravene public policy as expressed either positively or impliedly in the state or federal constitutions, that the courts are authorized to declare solemn legislative enactment null and void.

"The constitution does not attempt to give the definition of a county purpose. Some latitude must be allowed to the Legislature in determining for what purposes counties will be allowed to levy taxes, under Section 5 of Article IX. By Chapter 9418 of the Laws of 1923, the legislature has said that the purpose for which these bonds are to be issued is a county purpose, and inasmuch as we cannot say that the particular enactment has no practical or legal relation whatever to any county purpose, it becomes our duty to uphold the constitutionality of the act so far as the same is brought in question in this case."

The decision of the court below, validating the bonds, will therefore be and is hereby affirmed.

Affirmed.

ELLIS AND STRUM, J. J., concur.

WHITFIELD, P. J., AND TERRELL AND BUFORD, J. J., concur in the opinion.

ELLIS, J., concurring.

I concur in the conclusion reached in this case upon the ground that a "county purpose," within the meaning of that phrase as used in Section 5 of Article IX of the Constitution, is any governmental purpose which the Legislature may, within constitutional limitations, authorize counties to execute as political divisions of the state which purpose has not been declared by the Legislature or Constitution to be————————a state purpose.

The Constitution creates the office of Commissioner of Agriculture and leaves the duties to be performed by such officer to be prescribed by the Legislature, Article IV, Section 26. The policy of the government of this State, as organized under the Constitution of 1885, therefore extends to the making of adequate and appropriate provisions for encouraging and developing the Agricultural Industry in this State.

That purpose has not been declared by the Legislature to be a state function to be directed and executed in every detail by state officials, bureaus and commissions in every county or political division of the state but there has been left some phases of the general purpose to be executed by counties as a county purpose.

When the Legislature authorizes a county in that behalf to maintain agricultural fairs and erect buildings for the purpose it inferentially, if not directly, declares such activity to be a county purpose and in doing so the Legislature acts within the constitutional limitations upon its powers.

WHITFIELD AND BUFORD, J. J. concur.