Dade County, Florida, prior to 1946, acquired a public airport known as "Pan American Airport" or "36th Street Airport". The Federal Government gave or sold to Dade County two airports situated adjacent to each other and referred to as (a) "Miami Army Air Base" and (b) "Miami Air Depot". The title to the facilities was taken in the name of Dade County Port Authority and by law were under the supervision and control of the Board of County Commissioners of Dade County. The three facilities were merged by the Port Authority and designated as the Miami International Airport and continuously since has been operated by the County of Dade as an airport in serving the general public.
A map or plat of the three properties discloses that Pan American or 36th Street Airport is now separated from the Miami Army Air Base and Miami Air Depot by a tract of land comprising approximately 94.15 acres owned by the Seaboard Air Line Railroad Company. The Seaboard has, over the years in the operation of its railroad system, constructed on the 94.15 acres freight yards, shops, buildings, numerous tracks and other structures and is known locally as Hialeah Yards. Its main line track between the City of Miami and the City of Homestead traverses the 94.15 acres. The operation of the Seaboard trains and other facilities situated on the 94.15 acres interferes with and creates a hazard to the operation of all types of planes entering and leaving the Miami International Airport. The Airport and the Seaboard have operated the properties since 1946 under a lease agreement. The dangers to human life and *Page 450 
property are admitted. A threat to close the Miami International Airport by the Federal Aeronautics Commission because of these hazards has been received by the Miami International Airport authorities.
The County Commissioners of Dade County and the officials of the Seaboard, after negotiations, signed a written agreement identified as Exhibit "B", by the terms of which the Seaboard agreed to sell for the sum of $2,625,000.00 the 94.15 acre tract to the County of Dade and the County of Dade agreed to purchase the property for said sum but the expense of removal, relocation and reconstruction of the facilities now situated on the tract and used by the Seaboard was to be paid for by the County of Dade at an additional sum of $200,000.00, which amount was acceptable to the County Commissioners of Dade County. One of the questions presented here is the validity of the contract to purchase the property in behalf of Dade County and to pay for the same according to the financial plan appearing in the record.
The power and authority of the Board of County Commissioners of Dade County, Florida, acting as the Dade County Port Authority, to sign the purchase and sale agreement with the Seaboard and obligate the County of Dade to pay the several sums set out and designated in the written agreement of the parties appear positive and certain. See Chapter 22963, Acts of 1945, Laws of Florida, and as amended by Chapter 24296, Acts of 1947, Laws of Florida, and as amended by Chapter 25166, Acts of 1949, Laws of Florida; Chapter 332, F.S.A., Chapter 22846, Acts of 1945, Laws of Florida; State ex rel. Gibbs v. Gordon, 138 Fla. 312,189 So. 437; State of Florida v. County of Monroe,148 Fla. 111, 3 So.2d 754. The purported deed conveying the 94.15 acre tract by the Seaboard into the County of Dade is in substantial compliance with the terms of the written agreement of the parties.
Dade County, according to the record, does not have available the $3,000,000.00 required and necessary to purchase the 94.15 acre tract from the Seaboard and to finance the expansion program of the Miami International Airport. It proposes to issue revenue certificates for the purpose in the sum of $3,000,000.00. The Bessemer Securities Corporation has signified a willingness to purchase the proposed certificates under conditions unnecessary here to recite. The Port Authority, in furtherance of the plan, adopted Resolutions identified by the record as Exhibits "D" and "E". These Resolutions, and the revenue certificates issued pursuant thereto, set out that the certificates are not general obligations of the County of Dade nor a pledge of the credit of the County or its power of taxation. The purchasers of the certificates are required to look for payment to the Special Fund designated as "Miami International Airport Expansion and Development Fund".
Resolutions 234 and 235 adopted by the Dade County Port Authority obligate it to deposit to the credit of the above named Special Fund money sufficient in the amount to meet and pay all interest and principal of the proposed revenue certificates. These moneys with which to pay the maturing principal and interest on the proposed certificates are financed from two sources: (1) from the net proceeds of money arising from the operation of the Miami International Airport; and (2) an ad valorem tax on all the taxable property of Dade County as provided for by amended Section 5 of Chapter 25166, Acts of 1949, Laws of Florida. This Section authorizes a levy of one mill for an enumerated airport purpose and a one-half mill for the purchase and improvement of the airport. The proceeds of the two levies, in a general sense, are for the purchase of land and the expansion and development of the airport as owned by the County of Dade.
A pertinent portion of Section 6 of the Port Authority's Resolution is viz.:
"That when the said sum of money is so borrowed, the Chairman and Clerk of this Board are hereby authorized, empowered and directed in the name and on behalf of this Board to execute and deliver unto the said Bessemer Securities, Inc. Special *Page 451 
Fund Certificates, in the following form, aggregating the principal sum of Three Million ($3,000,000.00) Dollars, to be dated as of July 15, 1949, and to bear interest from date at the rate of three and one-half (3 1/2%) per centum per annum, interest to be payable on March 15th and September 15th of each year and to mature annually, March 15, in the following years and amounts:
Year of Maturity Amount
 1950 $300,000.00
 1951 325,000.00
 1952 425,000.00
 1953 500,000.00
 1954 500,000.00
 1955 500,000.00
 1956 450,000.00

which certificates shall be payable, as to both principal and interest, solely from the Special Fund, known as Miami International Airport Expansion and Development Fund, established by resolution of this Board on the 25th day of July, 1949, and from the surplus revenues of said airport as defined by Section 514 of that certain Trust Agreement dated as of July 1, 1947, between Dade County Port Authority and Chemical Bank and Trust Company, as Trustee, as amended by that certain Supplemental Trust Agreement between the same parties dated as of July 1, 1948."
The revenue certificates in the sum of $3,000,000.00 are to be issued by the Dade County Port Authority and sold to Bessemer Securities, Inc., for the following purposes and no other: First, the sum of $2,625,000.00 is to be paid to the Seaboard for the 94.15 acre tract; second, the sum of $200,000.00 is to be used in financing the costs of removing and relocating at another site the railroad, railroad yards, shops and facilities of the railroad according to the agreement of the parties; third, the remaining $175,000.00 is to be used for incidental expenses incurred in acquisition of the land and the removal of the facilities of the Seaboard to another site — also for the construction of additional facilities at the Airport.
Suit for a declaratory judgment or decree under the several provisions of Chapter 87, F.S.A., was filed in the court below and attached to and made a part of the bill of complaint were several Exhibits, some of which were adduced and filed in evidence. An answer was filed and the Chancellor heard evidence and made findings of fact and these findings were made a part of the final decree. The Chancellor decreed that the Resolutions adopted by the Dade County Port Authority, the contract of sale and purchase of the 94.15 acre tract, the purported deed of conveyance, and the Resolutions authorizing the issuance of revenue certificates in the sum of $3,000,000.00 were each valid and binding instruments. A careful study and thorough consideration of the several issues presented is reflected by the final decree entered below. An appeal has been perfected here.
The power and authority of the Dade County Port Authority to issue the contemplated revenue certificates and to pledge the net proceeds of the profits arising from the operation of the Miami International Airport, or so much thereof as is necessary to keep these obligations current, is settled law in Florida. See State and Diver v. City of Miami, 113 Fla. 280, 152 So. 6; State v. City of Lake City, 116 Fla. 10, 156 So. 924; State v. City of Daytona Beach, 118 Fla. 29, 158 So. 300, and similar cases.
The Chancellor below held that the Dade County Port Authority had the power, under Chapter 22963, Acts of 1945, as amended by Chapter 24296, Acts of 1947, and as further amended by Chapter 25166, Acts of 1949, to levy an ad valorem tax of one and one-half mills on all the taxable property of Dade County, Florida, without the vote of the freeholders as provided for by Section 6 of Article 9 of the Constitution of Florida, F.S.A., the proceeds of the levy, with portions of the net profits of the Airport operations, to be placed in a Special Fund and used only to service the certificates of indebtedness. The money arising from the sale of the certificates to be used by the Dade County Port Authority in financing the costs of acquisition of land, *Page 452 
and the construction, improvement and development of the Miami International Airport and for no other purpose or purposes. It is contended that this ruling is erroneous.
A pertinent provision of the final decree is viz.:
"Miami International Airport has become and is now one of the most important international airports in the world; more than forty per cent. of all of the foreign passengers entering all ports of entry in the United States and its territories, by aerial transportation, enter through Miami International Airport; approximately 1,000,000 people pass through the said airport annually and in addition thereto, some 13,000 tons of international cargo, 4,000 tons of interstate and domestic cargo and approximately 3,000 tons of mail are handled annually into and out of said airport; Pan American Airways, which is one of the largest if not the largest airline in the world, maintains on said airport its overhaul base in which all of the airplane motors and other equipment of every airplane used in its world wide system is overhauled; Eastern Airlines, which is one of the largest of the airlines in America, maintains its system overhaul base on said airport; in addition to these, many other airlines overhaul their motors and airplanes at said base and many independent engine overhaul companies maintain their shops there; so that, as a result of the activities of the airlines and their allied industries on said airport there are directly employed in Dade County approximately 15,000 highly paid skilled mechanics and other operational executive and administrative personnel. Most of the employees of said industry are heads of families, and plaintiffs have conservatively estimated that there are not less than 40,000 people in Dade County who are directly employed or are directly dependent upon the aviation activities which are carried on either on the airport or as a result of the aviation facilities located thereon. The annual expenditures of aviation in Dade County, including payrolls, rents, taxes and the purchase of materials and supplies, amounts to more than $60,000,000.00. In addition to this direct expenditure in the County, the aviation business is responsible for the expenditure in Dade County and in Florida generally of many millions of dollars additional because of the tourists which are brought into the State of Florida not only from all of North America but from South and Central America and the Carribean area."
Pursuant to statutes and applicable law, after due and proper notice, the Chancellor heard testimony adduced by the respective parties on the issues presented by the pleadings. The parties were heard through counsel and thereafter the Court made findings of fact based upon the testimony then in the record. Among the findings of fact made and set out in the final decree were: that the proposed certificates of indebtedness did not obligate or pledge the taxing power of the County of Dade for the payment thereof, nor were the proposed certificates liens against any property situated in Dade County; that the County of Dade was without lawful authority to levy a tax and from the proceeds arising therefrom pay the indebtedness represented by the certificates, but the only source of payment of the proposed certificates was solely from the Special Fund identified by the record as the Miami International Airport Expansion and Development Fund. The record failed to disclose a taxpayer of Dade County opposing the issuance of the certificates of indebtedness. Findings of fact as made by a Chancellor will not usually be disturbed on appeal. Kent v. Knowles, 101 Fla. 1375,133 So. 315, and similar cases.
Chapter 22963, Acts of 1945, Laws of Florida, authorized counties of Florida having a population of 260,000, or more, through the Boards of County Commissioners (1) to acquire or construct airports; (2) to improve harbors and navigable streams; (3) to acquire all real esstate incidental and necessary for the operation thereof; (4) to regulate and license airports and harbors; (5) to issue revenue bonds, payable solely from revenues therefrom, and to pledge the revenues to secure the payment of the bonds; (6) to enter into all contracts incident and necessary for the operation of harbors and airports; *Page 453 
(7) to fix rules and regulations for the collection of revenues arising from the operation of the harbors and airports; (8) other plenary powers by the terms of the Act were conferred on the Boards of County Commissioners. The Act supra is applicable to Dade County, Florida. Section 5 is viz.: "Ad Valorem Tax. — Annually an ad valorem tax of not exceeding one mill may be levied upon all property in such County, which tax when levied shall be levied and collected as other such county taxes are levied and collected, and subject only to the limitation on a general fund as contained in Section 193.32, Florida Statutes, 1941; such taxes shall be charged to the general fund, but such revenue may be appropriated by said County to advance any project herein specified. Such tax when levied and collected shall be used only for the purposes specified in this Act, and when so levied, collected and used shall be considered to be levied,collected and used for a county purpose." (Emphasis supplied.)
The terms and provisions of Chapter 22963, supra, provided for the acquisition and operation of both harbors and airports in Dade County and placed the same under the control and management of the Board of County Commissioners. The terms and provisions of the Act made harbors and airports county purposes and granted full power and authority to the Board to do any and all things incident to the control and operation, inclusive of financing the same and the issuance of certificates of indebtedness and the levy of an ad valorem tax with which to pay the certificates of indebtedness as issued. In the case of State v. Brevard County,99 Fla. 226, 126 So. 353, we held that the Legislature had the power to declare what was a county purpose and the courts would not interfere with the findings of the Legislature unless such findings had no legal or practical relation to a valid county purpose. The validity of the findings of the Legislature in the Act is not questioned on this appeal. The Court will presume that the Legislature intended to enact a valid constitutional enactment. State v. Goodgame, 91 Fla. 871, 108 So. 836, 47 A.L.R. 118.
Airports are as essential to commerce as terminals are to railroad, or harbors to navigation, or as docks and harbor facilities are to marine shipping. Enterprising communities are now alert to the many benefits and advantages flowing from this class of transportation. The airway, in many respects, may be compared to a system of arterial highways or a system of railroads contacting the different communities of the Country, or as bridges or links connecting streams or expanses of water areas. The lanes of travel through the air, over both land and water, are now and were established with the same caution and precision that an engineer adopts in chartering the course of a highway or surveying the location of a proposed railroad system. An airport or safe landing field is a vital and indispensable link in this system of transportation. Our modern airports render a public service similar to other governmental functions which promote the health, comfort and safety of the people and the general welfare of our State and Nation.
The following provision of Section 5 of Article 9 of the Constitution of Florida was made effective by the people in 1887 — it appeared in the Constitutions of 1868, 1865, 1861 and 1838: "The Legislature shall authorize the several counties and incorporated cities or town in the State to assess and impose taxes for county and municipal purposes, and for no other purposes, and all property shall be taxed upon the principles established for State taxation." Section 5 of Article 8 of the Constitution of Florida provides that the power, duties and compensation of County Commissioners shall be prescribed by law. In Skinner v. Henderson, 1890, 26 Fla. 121, 7 So. 463, 8 L.R.A. 55, we held that the construction of a bridge within a municipality was not a county purpose authorizing an ad valorem tax. In the case of Stockton v. Powell, 1891, 29 Fla. 1, 10 So. 688, 689, 15 L.R.A. 42, we held an ad valorem levy to improve "navigation of St. Johns River" was a valid county purpose. In County Com'rs of Escambia County v. Board of Pilot Com'rs, 1906,52 Fla. 197, 42 So. 697, 120 Am.St. Rep. 196, we sustained as a county purpose *Page 454 
"the improvement of a harbor" in Pensacola Bay. The act authorized an ad valorem tax. In Jordan v. Duval, 1911, 68 Fla. 48, 66 So. 298, we sustained as a county purpose the erection of an "armory building in the City of Jacksonville" and was financed by an ad valorem tax. The sum of $2750.00 for the maintenance of the State Militia by Manatee County was made a county purpose by Special Act and the levy of an ad valorem tax was here sustained in Rushton v. State, 75 Fla. 422, 78 So. 345. The creation of a Welfare Board for Duval County and authorizing an ad valorem levy was held a county purpose in State ex rel. Buford v. Daniel,87 Fla. 270, 99 So. 804. The levy of an ad valorem tax with which to construct buildings to house agricultural fairs was held a county purpose in Earle v. Dade County, 92 Fla. 432, 109 So. 331. An ad valorem levy by Walton County to construct a general hospital was held a county purpose in State v. Walton County, 97 Fla. 59,119 So. 865.
In the case of Tapers v. Pichard, 124 Fla. 549, 169 So. 39, decided since the adoption (in 1930) of Section 6 of Article 9, the Board of County Commissioners adopted a resolution authorizing the issuance of tax anticipation certificates by Leon County for the purpose of constructing a jail. The resolution provided for a tax levy of five mills annually for five years on all property in Leon County. This was earmarked as a special fund for the payment of the certificates. On appeal here it was contended that a vote of the freeholders of Leon County was necessary under Section 6 of Article 9 of the Constitution. We ruled against the contention and sustained the issuance of the certificates without a vote of the freeholders of Leon County. The same contention was urged here in State ex rel. Houston v. Hillsborough County, 136 Fla. 503, 183 So. 157. The Board of County Commissioners issued and sold certificates and bought voting machines for the county. We held the certificates were not bonds within the meaning of Section 6 of Article 9 of the Constitution and cited as authority our previous holding in Tapers v. Pichard, 124 Fla. 549, 169 So. 39.
State ex rel. Gibbs v. Gordon, 138 Fla. 312, 189 So. 437, authorized Duval County to levy and pay from its general revenue fund the initial costs of constructing an airport in Duval County, Florida. The County was authorized to issue promissory notes in a sum not exceeding $25,000.00 to be used as preliminary expenses incident to the acquisition of land and the construction of an airport. The contention was made here that the notes constituted bonds within the meaning of Section 6 of Article 9, but we brushed the contention aside and cited as our authority Tapers v. Pichard and State ex rel. Houston v. Hillsborough County, supra. A similar ruling was made in State v. Monroe County, 148 Fla. 111, 3 So.2d 754, 756. Pertinent language employed is viz.: "* * * What constitutes a county purpose is not static and inflexible. If we had been confronted with this question in the days of the pony express, we would have doubtless held the act bad but in a day when the country is air minded, when travel and commodity conveyance by air is such a vital part of the daily life and is so intimately connected with the general welfare we must refrain from holding that it is not a proper county purpose as contemplated by the Constitution."
The case of Posey v. Wakulla County, 148 Fla. 115, 3 So.2d 799, involved the financing and construction of a court house in Wakulla County. Chapter 20768, Acts of 1941, authorized the Board of County Commissioners to apply annually a portion of the race track money due the county to the costs of construction of the court house at Crawfordville. Section 2 of Chapter 21621, Special Acts of 1941, authorized an annual ad valorem tax levy for five years on all taxable property situated in Wakulla County. Certificates of indebtedness were issued for the construction of the court house by the county from a special fund which pledged: (a) the race track fund; and (b) the five mill ad valorem levy. Posey, as a taxpayer, sought to enjoin the issuance of the certificates of indebtedness on the ground that the proposed certificates were bonds and could not be issued without a vote of the freeholders as required by *Page 455 
Section 6 of Article 9 of the Constitution and on various other grounds. We held against the contention and approved the annual tax levy against all the property in Wakulla County. We also held that the revenue certificates were not bonds within the meaning of Section 6 of Article 9. We further said that a vote of the freeholders of Wakulla County was not constitutionally required. The ruling was based on Tapers v. Pichard, supra. The ad valorem tax in the case at bar is to be levied for a period of seven years.
Rules used in construing statutes are, in general, applicable in construing provisions of Constitutions. Mugge v. Warnell Lbr. Co., 58 Fla. 318, 50 So. 645. In construing our Constitution it is the duty of the courts to ascertain and effectuate the intention and purpose of the people in adopting it. The intent may be determined by (a) express provisions thereof; (b) it may appear by the intendments; (c) or by implication; (d) or the history surrounding its adoption may prove helpful. Getzen v. Sumter County, 89 Fla. 45, 103 So. 104; Amos v. Mathews, 99 Fla. 1, 126 So. 308.
Prior to the year 1930, many abuses occurred in political units of Florida by creating public debts and the issuance of bonds. The voters of Florida terminated this unhealthy condition by the adoption of Section 6 of Article 9 of our Constitution. The effect thereof was to place the power to incur public debt and issue bonds, with described exceptions on the part of a political unit, in the hands of the freeholders by an approving vote at an election called for the purpose. Certificates of indebtedness issued by a political unit, under authority granted by the Legislature functioning in a proprietary capacity pledging revenues only of the utility owned by it, are not bonds within the meaning of Section 6 of Article 9, as the issuing unit in no manner pledges its taxing power for their payment — the certificates are not made liens against the lands situated therein — the purchasers can look only to the Special Fund pledged for their payment and no other.
The voters of Florida in 1930 placed no limitations or restrictions about the provisions of Section 5 of Article 9 of our Constitution. The Legislature, on occasions prior and subsequent to 1930, by legislative enactment, authorized local taxation for county purposes, provided the purpose declared by the Act bore a fair and just relation to a public governmental purpose, thereby advancing or promoting the general welfare of the local unit. Our courts, since 1887, on numerous occasions with few exceptions, have sustained enactments authorizing ad valorem levies for various projects embracing wide areas of activity, thereby promoting the general welfare, which were absolutely essential to the progress and development of many sections of Florida. We have no taxpayers of Dade County opposing the validation of the certificates. There are no constitutional inhibitions against the levy of an ad valorem tax in Dade County to implement the net revenues of the Miami International Airport with which to service the revenue certificates — the proceeds thereof to be used by Dade County in constructing, operating and improving the Miami International Airport.
Affirmed.
ROBERTS, J., concurs.
ADAMS, C.J., and TERRELL, J., concur in judgment.
HOBSON, J., concurs specially.
THOMAS, J., dissents.
SEBRING, J., not participating.