# Supreme Court of Florida

_____

No. SC15-1261
_____

**CITY OF LARGO, FLORIDA,**
Petitioner,

vs.

**AHF-BAY FUND, LLC,**
Respondent.

[March 2, 2017]

QUINCE, J.

This case is before the Court for review of the decision of the Second

District Court of Appeal in AHF-Bay Fund, LLC v. City of Largo, 169 So. 3d 133

(Fla. 2d DCA 2015). In its decision, the district court ruled upon the following

question, which the court certified to be of great public importance:

> DO PILOT AGREEMENTS THAT REQUIRE PAYMENTS
> EQUALING THE AD VALOREM TAXES THAT WOULD
> OTHERWISE BE DUE BUT FOR A STATUTORY TAX
> EXEMPTION VIOLATE SECTION 196.1978, FLORIDA
> STATUTES (2000), AND ARTICLE VII, § 9(a) OF THE FLORIDA
> CONSTITUTION?

Id. at 138.  We have jurisdiction.  See art. V, § 3(b)(4), Fla. Const.  For the reasons that follow, we answer the certified question in the negative and quash the decision of the Second District.

**FACTS**

AHF-Bay Fund, LLC (AHF) appealed a judgment awarding $695,158.23 in damages and prejudgment interest to the City of Largo, Florida (City) for AHF's failure to make payments pursuant to an agreement for payment in lieu of taxes (PILOT agreement) between the City and RHF-Brittany Bay (RHF), AHF's predecessor in interest.  AHF-Bay Fund, 169 So. 3d at 135.  Under the agreement, AHF was required to make payments that equaled the ad valorem taxes that would have otherwise been due but for the statutory tax exemption found in section 196.1978, Florida Statutes (2000).  Id.  The facts that prompted the filing of suit are as follows:

> In December 2000, RHF acquired the subject property.  RHF was a tax exempt 501(c)(3) organization as defined by the Internal Revenue Code.  See 26 U.S.C. § 501(c)(3) (2000).  RHF planned to develop the property to provide affordable housing for persons with low to moderate income pursuant to chapter 420, Florida Statutes.  As set forth in section 196.1978, Florida Statutes (2000), affordable housing projects owned by a 501(c)(3) organization are exempt from ad valorem taxation.
>
> To finance the project, RHF reached an agreement with the City wherein the City would arrange for the issuance of tax-exempt bonds that carried a considerably lower interest rate than RHF could have obtained using traditional bank financing.  In exchange for the issuance of the bonds, RHF entered into the PILOT agreement,

thereby agreeing to make annual payments to the City "in an amount equal to the portion of ad valorem taxes to which the City would otherwise be entitled to receive for the [p]roperty as if the [p]roject were fully taxable in accordance with standard taxing procedures." The PILOT agreement provided that the amount of the payments would be determined by multiplying the property's assessed value by the millage rate established by the City each year. The PILOT agreement also provided that "the City has and will provide services to [RHF] as a result of [RHF's] status as a tax-exempt entity."

The PILOT agreement specified that it was binding on any subsequent owners of the subject property as long as certain conditions were met, though it made no mention of a covenant running with the land. The PILOT agreement was not recorded in the official public records. However, simultaneously with the execution of the PILOT agreement, the parties executed a memorandum of agreement that was recorded in the public records. The memorandum indicated that the PILOT agreement was available for inspection in the city clerk's office and that it imposed certain covenants running with the land.

RHF made the payments as required by the PILOT agreement for the years 2001 through 2005. AHF, also a nonprofit affordable housing provider, acquired the property in November 2005. AHF has continued to own and operate the property as an affordable housing community since the purchase. However, when the City did not receive the annual payment that was due on December 31, 2006, it contacted AHF. AHF denied knowledge of either the PILOT agreement or the memorandum of agreement, asserting that neither had been shown to be an exception to coverage in its title insurance policy and that neither had been referenced in the special warranty deed by which AHF took title.

Based upon AHF's refusal to make payments under the PILOT agreement, the City filed suit in 2010. The City sought a summary judgment and the trial court granted the motion in part. Ultimately, the trial court entered a final judgment in favor of the City, awarding $695,158.23 in damages and prejudgment interest.

Id. at 134-35 (alterations in original) (footnote omitted).  On appeal, the Second District reversed the trial court, finding that the PILOT agreement at issue "violates the public policy of promoting the provision of affordable housing for low to moderate income families and is therefore void."  Id. at 138.  The court reasoned that the PILOT payments are the substantive equivalent of taxes because the payments are equal to the amount of taxes that would be due if the property were not tax-exempt.  Id.

## ANALYSIS

The certified question presents two issues: (1) whether the PILOT agreement violates section 196.1978, Florida Statutes (2000), and (2) whether the PILOT agreement violates article VII, section 9(a) of the Florida Constitution.  Each will be addressed in turn.  Because the issues before this Court on the certified question involve pure questions of law that arise from undisputed facts, they are reviewed de novo.  Jackson-Shaw Co. v. Jacksonville Aviation Auth., 8 So. 3d 1076, 1084-85 (Fla. 2008).

The Second District invalidated the PILOT agreement between the City and AHF by finding that the agreement violated section 196.1978, Florida Statutes (2000), and violated the public policy of "promoting the provision of affordable housing for low to moderate income families."  AHF-Bay Fund, 169 So. 3d at 138.  Specifically, the Second District held that "section 196.1978 expressly prohibits ad

- 4 -

valorem taxation on properties being used for affordable housing." Id. at 136.

Section 196.1978, Florida Statutes (2000), provides in relevant part:

> Property used to provide affordable housing serving eligible persons as defined by s. 159.603(7) and persons meeting income limits specified in s. 420.0004(9), (10), and (14), which property is owned entirely by a nonprofit entity which is qualified as charitable under s. 501(c)(3) of the Internal Revenue Code and which complies with Rev. Proc. 96-32, 1996-1 C.B. 717, shall be considered property owned by an exempt entity and used for a charitable purpose, and those portions of the affordable housing property which provide housing to individuals with incomes as defined in s. 420.0004(9) and (14) shall be exempt from ad valorem taxation to the extent authorized in s. 196.196. All property identified in this section shall comply with the criteria for determination of exempt status to be applied by property appraisers on an annual basis as defined in s. 196.195.

§ 196.1978, Fla. Stat. (2000).

We find that the plain language of the statute does not expressly prohibit ad valorem taxation on nonprofit entities that provide low-income housing. Instead, the section provides an exemption to nonprofit entities. However, the statute also requires the nonprofit entity, here the owner of an affordable housing project, to take affirmative steps to take advantage of the exemption. Specifically, section 196.1978 requires the owner to "comply with the criteria for determination of exempt status to be applied by property appraisers on an annual basis as defined in s. 196.195." For example, if a nonprofit owner of a property forgets to file its annual form with the property appraiser then its tax exemption will be waived for that year. See § 196.011, Fla. Stat. (2000). From the text of the statute it is clear

that the exemption is not automatic, nor is ad valorem taxation on such properties "expressly prohibited."

Numerous courts have held that tax exemptions can be waived. E.g., Housing Auth. of Poplar Bluff v. Eastwood, 736 S.W.2d 46 (Mo. 1987) (citing Sprik v. Regents of Univ. of Michigan, 204 N.W.2d 62 (Mich. Ct. App. 1972) (public university could waive property tax exemption); Clark v. Marian Park, Inc., 400 N.E.2d 661, 664-65 (Ill. App. Ct. 1980) (nonprofit owner of affordable housing project waived tax exemption by agreeing to pay taxes in annexation agreement with the city); Christian Bus. Men's Comm. v. State, 38 N.W.2d 803, 81 n.7 (Minn. 1949) ("Failure to use due diligence in asserting a right to tax exemption may constitute a waiver of the right."); Rutgers Chapter of Delta Upsilon Fraternity v. City of New Brunswick, 28 A.2d 759, 761 (N.J. 1942) (taxpayer waived tax exemption by failing to claim exemption in manner required by statute and voluntarily paying taxes).

This case is factually similar to Eastwood, in which the Supreme Court of Missouri concluded that a PILOT agreement between a city and a tax-exempt housing authority did not violate public policy because tax exemptions are waivable. Eastwood, 736 S.W.2d at 47-48. The PILOT agreement in that case expressly acknowledged that the housing project was exempt from taxes. Nonetheless, the housing authority agreed to payments in lieu of taxes in exchange

for the city providing general municipal services. In rejecting the argument that the agreement was void as against public policy, the Missouri Supreme Court reasoned that courts throughout the country have held that tax exemptions are waivable and that the agreement showed that the housing authority made a voluntary decision to subject itself to payments notwithstanding its exempt status. Id. at 47. We agree with the decision of that court as well as other courts that have held similarly.

In the instant case, RHF made a voluntary decision to subject itself to payments equaling the ad valorem taxes notwithstanding its tax-exempt status. Therefore, while nonprofit entities are typically exempt from ad valorem taxes, this is an exemption that may be waived either due to a lack of due diligence in meeting the requirements of the statute or by voluntarily agreeing to waive the exemption as the result of a contractual agreement. Consequently, we find that the statute does not expressly prohibit the payment of ad valorem taxes or payments that equal the amount of taxes that would be due if a property owner decides to waive the exemption and enter into a contractual agreement, as was done here.

Because the statutory exemption can be waived, and there is no statutory or constitutional provision that expressly prohibits the exaction of ad valorem taxes on nonprofit entities, this Court would only find the agreement void in the event that it is "clearly injurious to the public good" or "contravene[s] some established

interest of society." <u>Fla. Windstorm Underwriting v. Gajwani</u>, 934 So. 2d 501, 507 (Fla. 3d DCA 2005) (quoting <u>Banfield v. Louis</u>, 589 So. 2d 441, 446 (Fla. 4th DCA 1991)). Courts typically do not strike down a contract, or any portion of a contract, based on public policy grounds except in extreme circumstances:

> Courts . . . should be guided by the rule of extreme caution when called upon to declare transactions void as contrary to public policy and should refuse to strike down contracts involving private relationships on this ground, unless it be made clearly to appear that there has been some great prejudice to the dominant public interest sufficient to overthrow the fundamental public policy of the right to freedom of contract between parties sui juris.

<u>Id.</u> (quoting <u>Banfield</u>, 589 So. 2d at 446-47 (quoting <u>Bituminous Cas. Corp. v. Williams</u>, 17 So. 2d 98, 101-02 (Fla. 1944))).

In its decision, the Second District recognized that there is a strong public policy of "promoting the provision of affordable housing for low to moderate income families." <u>AHF-Bay Fund</u>, 169 So. 3d at 138. However, there is also a strong public policy favoring freedom of contract. "Freedom of contract is the general rule . . . ." <u>State ex rel. Fulton v. Ives</u>, 167 So. 394, 412 (Fla. 1936). "[I]t is a matter of great public concern that freedom of contract be not lightly interfered with." <u>Bituminous Cas. Corp.</u>, 17 So. 2d at 101. "[R]estraint is the exception, and when it is exercised to place limitations upon the right to contract . . . it can be justified only by exceptional circumstances." <u>Ives</u>, 167 So. 2d at 412. In the instant case, the City and RHF entered into a voluntary agreement, supported by

valid consideration. The parties agreed on the method of calculating the consideration for their agreement and, until 2005, performed their respective obligations. While the Second District correctly noted the public policy favoring affordable housing for low-income families, we find that this contract supported that public policy by enabling RHF to procure the funding necessary for the building of the apartment complex. But for the tax-exempt bonds that RHF received in exchange for these payments, the affordable housing complex might never have been built. Therefore, we preserve the agreement between the City and RHF, considering the long-standing policy to uphold contracts between parties and the fact that the contract here supported another public policy, that of providing affordable housing to low-income families.

The Second District also invalidated the PILOT agreement on the ground that it violated article VII, section 9(a) of the Florida Constitution. Article VII, section 9(a) of the Florida Constitution provides in relevant part:

> Counties, school districts, and municipalities shall, and special districts may, be authorized by law to levy ad valorem taxes and may be authorized by general law to levy other taxes, for their respective purposes, except ad valorem taxes on intangible personal property and taxes prohibited by this constitution.

Art. VII, § 9(a), Fla. Const. In its decision, the district court concluded that the payments under the PILOT agreement are, in substance, disguised ad valorem taxes, and the City did not have the authority to impose taxes in circumvention of

the affordable housing tax exemption.  AHF-Bay Fund, 169 So. 3d at 137.  Thus, the court held that the PILOT agreement violated article VII, section 9(a) of the Florida Constitution, which provides that cities may only impose taxes as permitted by law.  Id.

What constitutes a "tax" has been well established by Florida courts.  A tax is an enforced burden imposed by a sovereign right for the support of the government, the administration of law, and the exercise of various functions the sovereign is called on to perform.  State v. City of Port Orange, 650 So. 2d 1, 3 (Fla. 1994) (citing Klemm v. Davenport, 129 So. 904, 907 (Fla. 1930); City of Boca Raton v. State, 595 So. 2d 25 (Fla. 1992)).  Thus, there are two factors that exist when taxes are imposed: (1) the government acts unilaterally by sovereign right, and (2) the government acts in order to support routine government functions.

Neither of the two factors are present here.  First, the City did not act by sovereign right in entering into the agreement with RHF.  Local governments operate in several different capacities, including proprietary (i.e., as a party to a contract), and governmental (i.e., by sovereign right).  E.g., Daly v. Stokell, 63 So. 2d 644, 645 (Fla. 1953); Commercial Carrier Corp. Indian River Cty., 371 So. 2d 1010 (Fla. 1979).  Here, the City's decision to accept RHF's offer and enter into the PILOT Agreement was a proprietary one.  See Daly, 63 So. 2d at 645.

> [A]ny contract . . . that redounds to the public or individual advantage and welfare of the city or its people is proprietary, while a government function, as the term implies, has to do with the administration of some phase of government, that is to say, dispensing or exercising some element of sovereignty.

Id. The City did not exercise any element of sovereignty by entering into the PILOT Agreement. When a city enters into an express, written contract it waives sovereign immunity. Pan-Am Tobacco Corp. v. Dep't of Corr., 471 So. 2d 4 (Fla. 1984).

In its decision, the Second District relied on our decision in State v. City of Port Orange, 650 So. 2d 1 (Fla. 1994), to conclude that the payments were ad valorem taxes disguised under another name and that the power to tax cannot be broadened by semantics. The issue in Port Orange was whether a "user fee" unilaterally imposed on all developed property for improving roads was really a "tax." Id. at 3. However, in this case, the City did not unilaterally impose any obligations, and the payments were not used for routine government functions, such as roads. The City and RHF negotiated the method to calculate the consideration for the City's authorization of the tax-exempt bonds. The City performed this non routine service specifically for RHF.

Furthermore, the obligation under the PILOT agreement was not citywide. Instead, the payments were offered to the City by RHF to induce the City to exercise its proprietary capacity to contract with the Capital Trust Agency for the

sole benefit of RHF. Respondent argues that the City used the PILOT payments as general revenue. However, Respondent fails to provide any evidence in support of this argument, and instead appears to take issue with the value of the City's service compared to its perceived benefit. Nonetheless, the PILOT agreement was consideration for the City to authorize the tax-exempt bonds. That authorization facilitated the conversion of the property to affordable housing.

Therefore, because the City did not act unilaterally by sovereign right for the purpose of supporting government functions, the payments negotiated by the City and RHF are not taxes and do not implicate article VII, section 9(a). Consequently, the agreement does violate the Florida Constitution.

## CONCLUSION

Because the PILOT agreement does not violate section 196.1978, Florida Statues (2000), or article VII, section 9(a) of the Florida Constitution, we answer the certified question in the negative and quash the decision of the Second District. We do not address Respondent's argument concerning whether the PILOT agreement at issue is a covenant with the land, as that issue is beyond the scope of the certified question. See McKenzie Check Advance of Fla., LLC. v. Betts, 112 So. 3d 1176, 1178 n.4 (Fla. 2013) (declining to address issue outside the scope of certified question).

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, CANADY, and POLSTON, JJ.,
concur.
LAWSON, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND
IF FILED, DETERMINED.

Application for Review of the Decision of the District Court of Appeal – Certified
Great Public Importance

      Second District - Case No. 2D14-408

      (Pinellas County)

Alan S. Zimmet and Nicole C. Nate of Bryant Miller Olive, P.A., Tampa, Florida;
and Elizabeth Wilson Neiberger of Bryant Miller Olive, P.A., Miami, Florida,

      for Petitioner

Joseph Hagedorn Lang, Jr. and Christopher William Smart of Carlton Fields
Jorden Burt, P.A., Tampa, Florida,

      for Respondent