NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT


HARMON PARKER, P.A. F/K/A          )
DAVIS & HARMON, P.A.,              )
                                   )
        Appellant/Cross-Appellee,  )
                                   )
    v.                             )        Case No.  2D18-4632
                                   )
SANTEK MANAGEMENT, LLC             )
A/A/O THE GERBER LAW GROUP,        )
P.A.,                             )
                                   )
        Appellee/Cross-Appellant.  )
                                   )
_____ )

Opinion filed September 25, 2020

Appeal from the Circuit Court for
Sarasota County; Hunter W.
Carroll, Judge.

Daniel A. Martinez and Weslee L. Ferron, of
Martinez Denbo, LLC, St. Petersburg, for
Appellant/Cross-Appellee.

Brandon G. Cathey, Brent G. Steinberg,
and Daniel L. Greene, of Swope, Rodante
P.A., Tampa, for Appellee/Cross-Appellant.

PER CURIAM.[1]

This appeal arises from a dispute between two law firms over the division of $3.16 million in contingency attorneys' fees derived from an $8 million personal injury settlement. The firm that initially secured the case, Gerber Law Group ("Gerber"), sued Harmon Parker, P.A., f/k/a Harmon, P.A. ("Harmon"), the firm that took over the case and obtained the settlement. Because the contract between the law firms was void for failure to comply with the applicable Florida Bar rules regulating contingency fee contracts, we reverse the judgment entered in favor of Gerber's assignee, Santek Management, LLC ("Santek").

On December 17, 2007, Ephraim Bryan was rendered a quadriplegic when his car collided with a motor vehicle driven by Louis Sticco. Shortly thereafter, Bryan executed a Contract for Representation with Gerber, that provided for contingency attorneys' fees consistent with the schedule established in rule 4.15(f)(4)(B)(1)a.-d. of the Rules Regulating the Florida Bar.

The same day, Bryan and his wife executed a Personal Injury Contingency Fee Contract with Gerber and Swope, Rodante, P.A. ("Swope"). That contract set total contingency attorney's fees of 40 percent of any gross recovery over $100,000. It also established a division of responsibilities and fees between the two firms. Gerber was responsible for the prosecution of the third-party damages and liability claims, and overall settlement evaluation, and would receive 62.5 percent of the fees. Swope would receive 37.5 percent of the fees in exchange for handling insurance coverage, extra-contractual

---

[1] All of the judges on this panel are sitting as Associate Judges of the Second District Court of Appeal by designation and order of the Chief Justice of the Florida Supreme Court.

liability, bad faith, defenses including settlement and accord and satisfaction, and assisting in pretrial negotiations. Because the potential total amount of fees exceeded those authorized by the fee schedule in rule 4-1.5, the agreement required court approval. Accordingly, the Bryans, Gerber, and Swope filed a Verified Petition for Approval of Attorneys' Fee Contract and Authorization of Division of Attorneys' Fees. The circuit court approved that petition.

In late July 2009, the trial court set the case for trial on January 25, 2010. At that time, Gerber had done little to prepare for trial. Furthermore, Gerber recognized it lacked the resources and experience to properly try the case. Swope declined to accept Gerber's invitation to assume additional responsibility to prepare the case for trial. As a result, Gerber contacted Harmon. Subsequently, the Bryans terminated their contract with Swope and entered into a new employment agreement with Gerber and Harmon. That agreement (hereinafter "the Agreement") was the subject of the underlying action.

The Agreement, executed by Gerber, Harmon, and the Bryans on August 20, 2009, provided for total contingency attorneys' fees of 40 percent of any gross recovery greater than $100,000. It further provided that the fees earned on any recovery up to $1 million would be split 75 percent to Gerber and 25 percent to Harmon. The fees earned on any recovery exceeding $1 million would be split equally between Gerber and Harmon. Notably, the Agreement did not detail the services each firm would provide as justification for the division of fees. Furthermore, the Agreement did not specify that Gerber and Harmon "agreed to assume joint legal responsibility to the client for the performance of the services in question as if each were partners of the other lawyer or law firm involved,"

3

see rule 4-1.5(f)(2), or that "each lawyer assumes joint legal responsibility for the representation," see rule 4-1.5(g)(2)(A).

Because the potential total amount of fees exceeded those authorized by the fee schedule in rule 4-1.5, the Agreement required court approval. On October 23, 2009, over two months after entering into the Agreement, Harmon, on behalf of the Bryans, filed an unsworn Petition for Approval of Fee Contract and Authorization of Division of Attorneys' Fees. The petition alleged that the Bryans had discharged Swope and hired Harmon as "co-counsel" with Gerber. It also alleged that the law firms "would accept substantially equal active participation" in providing legal services to the Bryans, but did not disclose the specific services to be performed by each counsel. Gerber did not sign the petition, and no Gerber attorney attended the hearing on the petition.

Although rule 4-1.5(f)(4)(D)(iii) required the petition to be filed within ten days of execution, sworn and signed by all counsel, and "disclose in detail those services to be performed" by each counsel, the circuit court granted the petition.[2]

Harmon obtained the Bryans' file from Gerber on the same day (August 20, 2009) that the Agreement was executed. The file contained some medical records and one deposition of the defendant, Sticco. (At the deposition, Sticco's counsel had conducted direct examination of his client, during which Sticco placed the blame for the collision on Bryan. Gerber conducted no cross-examination.) Thereafter, Gerber performed no further work on the case. By contrast, over the next four months, Harmon secured six or seven different experts and took more than twenty depositions. The costs incurred by Harmon exceeded $180,000.

---

[2] The judge who granted the petition was not the same judge who presided at trial.

4

On December 18, 2009, the case settled at mediation for $8 million. In January 2010, Harmon prepared a closing statement reflecting total attorneys' fees of $3,160,000. However, the closing statement allocated $1,280,000 to Gerber, rather than the $1,670,000 called for by the Agreement. Gerber initially consented to the modified fee allocation amount and signed the closing statement. One week later, Gerber withdrew its consent to the closing statement.

Harmon made payments totaling $1,280,000 to, or on behalf of, Gerber. Gerber claimed entitlement to an additional $390,000 and filed suit against Harmon. Prior to trial, Gerber assigned its rights to additional proceeds under the Agreement to Santek.

During the trial, the trial court ruled, as a matter of law, that the closing statement could not constitute a valid modification of the Agreement because Gerber did not consent to a modification until after the settlement of the Bryans' case.[3] Consistent with that ruling, the trial court instructed the jury that "[t]he parties to the Employment Agreement did not legally modify it."

The jury found that Harmon breached the Agreement but awarded no damages. The trial court subsequently granted Santek's Motion for Judgment in Accordance with Directed Verdict, in part, and entered judgment in favor of Santek for $390,000 plus prejudgment interest. Harmon timely appealed.

The record establishes that Gerber and Harmon failed, in several material respects, to comply with the Florida Bar rules regulating contingency fee contracts. Rule

---

[3] Santek argued, *inter alia*, that the alleged modification was void because it was not court approved as required by rule 4-1.5(f)(4)(D).

4-1.5(f)(4)(D) applies to those situations where a contingency fee is to be split between lawyers not in the same firm. Relevant to this appeal, the rule provides:

> (D) As to lawyers not in the same firm, a division of any fee within subdivision (f)(4) shall be on the following basis:
>
> (i) To the lawyer assuming primary responsibility for the legal services on behalf of the client, a minimum of 75% of the total fee.
>
> (ii) To the lawyer assuming secondary responsibility for the legal services on behalf of the client, a maximum of 25% of the total fee. Any fee in excess of 25% shall be presumed to be clearly excessive.
>
> (iii) The 25% limitation shall not apply to those cases in which 2 or more lawyers or firms accept substantially equal active participation in the providing of legal services. In such circumstances counsel shall apply to the court in which the matter would be filed, if litigation is necessary, or if such court will not accept jurisdiction for the fee division, the circuit court wherein the cause of action arose, for authorization of the fee division in excess of 25%, based upon a sworn petition signed by all counsel that shall disclose in detail those services to be performed. The application for authorization of such a contract may be filed as a separate proceeding before suit or simultaneously with the filing of a complaint, or within 10 days of execution of a contract for division of fees when new counsel is engaged. Proceedings thereon may occur before service of process on any party and this aspect of the file may be sealed. Authorization of such contract shall not bar subsequent inquiry as to whether the fee actually claimed or charged is clearly excessive. . . .

Because of the nature of the fee-splitting arrangement set forth in the Agreement, Gerber and Harmon were required to seek court approval for that arrangement. Rule 4-1.5(f)(4)(D)(iii) required the petition filed with the court to be sworn, signed by all counsel, filed within ten days of execution, and to disclose in detail the service to be performed by each counsel. Here, the petition failed to comply with any of these requirements.

Furthermore, rule 4-1.5(f)(4)(D)(iii) required Gerber and Harmon to accept substantially equal active participation in the providing of legal services. Given that the Agreement was silent on this matter and given that Gerber failed to sign the petition, the record establishes that Gerber also failed to properly comply with this requirement.

The fact that a circuit court judge approved the petition filed by Harmon does not change our analysis. Indeed, the rule expressly provides that approval of the petition does not bar subsequent inquiry.

"[A] contingent fee contract entered into by a member of The Florida Bar must comply with the rule governing contingent fees in order to be enforceable." *Chandris, S.A. v. Yanakakis*, 668 So. 2d 180, 185–86 (Fla. 1995). In *Chandris*, an injured seaman signed a retainer agreement with a Massachusetts attorney (Yanakakis) and a Florida law firm (Leesfield) to represent him. The contract was signed by Yanakakis, who was not a Florida Bar member, but not by Leesfield. The contract did not specify the division of fees. Later, the seaman settled directly with the ship owner and its insurer, Chandris. Yanakakis and Leesfield sued Chandris in federal court for tortious interference with the contract. On certification from the Eleventh Circuit Court, the Florida Supreme Court held that the contract was void as to both Yanakakis and Leesfield, stating:

> Florida contingent fee agreements entered by attorneys not subject to our professional regulations are unauthorized legal services and are void as against public policy. Florida contingent fee agreements entered into by attorneys subject to our regulations but which do not comply with the regulations are likewise void as against the public interest.

*Id.* at 181.

The court expressly disapproved earlier Florida appellate court cases to the extent "they may be read to hold that a contingent fee contract which does not comply with the

7

Code of Professional Responsibility or the Rules Regulating The Florida Bar is enforceable by an attorney who claims fees based upon a noncomplying agreement." *Id*. at 185. The court emphasized that it had determined that contingent fee contract requirements were necessary to protect the public interest. *Id.* at 186. Additionally, the court observed that enforcing contingent fee agreements that were not compliant with the rules governing contingent fee contracts would "constitute a competitive disadvantage to members of The Florida Bar who do comply with the rules." *Id.*[4]

The Fourth District Court of Appeal's decision in *Katz v. Frank, Weinberg & Black, P.L.*, 268 So. 3d 773 (Fla. 4th DCA 2019) is instructive. In that case, Katz, an associate attorney of Frank, Weinberg & Black ("former firm") was contacted by a potential client ("Taylor") about representing her in a qui tam/whistleblower action. After the managing partner of the former firm declined the case, Katz directed Taylor to another attorney, Vitale, who signed a retainer agreement with Taylor that did not mention Katz. Instead, Vitale emailed Katz stating that his "participation fee" would be 25 percent of the attorney's fees from any settlement. *Id*. at 775. Vitale filed suit in 2008. Katz left his former firm in 2013 without a written separation agreement. Thereafter, Katz called Taylor and Vitale about once a year to check on the case until it settled in 2016. Vitale sought to disburse 25 percent of the attorney's fees to Katz but requested a release from Katz's former firm. After the former firm refused to sign the release, Katz sued the former firm, but the trial

---

[4] The Supreme Court's public policy concern of rule-compliant attorneys being placed at a competitive disadvantage may well have been implicated in this case. There was evidence that Swope declined to accept primary responsibility for the case in July, 2009, in part, because of Swope and Gerber's inability to renegotiate their fee-splitting arrangement. Thereafter, Gerber and Harmon entered into the fee-splitting agreement at issue.

court granted summary judgment for the former firm, finding it was entitled to its participation fee because Katz was associated with the firm when he referred it to Vitale. *Id.* at 775–76.

Relying on *Chandris*, our sister court held that neither Katz nor his former law firm could enforce the "participation agreement" because the agreement was void as against public policy. In reaching that conclusion, the court emphasized that the agreement violated rule 4-1.5(f)(2) of the Rules Regulating The Florida Bar:

> Neither Katz nor the law firm entered into a written contract called for by the rule. Neither may enforce the 25% contingent participation fee agreement contained in Vitale's email. The agreement is void. Period.

*Katz*, 268 So. 3d at 776–77 (distinguishing the relationship between the attorneys from "a garden variety commercial dispute").

In the instant case, Gerber and Harmon failed to comply with the applicable Florida Bar rules regulating contingency fee contracts. The noncompliance by both Gerber and Harmon was substantial and significant. Given the Florida Supreme Court's binding holdings in *Chandris*, we conclude that the fee-splitting agreement between Gerber and Harmon was void as against public policy and, thus, unenforceable.

*Chandris* and *Katz* recognized that where an attorney is unable to enforce a contingency fee contract because of noncompliance with the Rules Regulating the Florida Bar recovery may be sought under a quantum meruit theory. However, to recover under a quantum meruit theory, a quantum meruit claim must be pled or tried by consent. *See Target Dev. Corp. v. Best Cty. Wide Constr. Corp.*, 457 So. 2d 1146 (Fla. 3d DCA 1984); *Boyce Constr. Corp. v. Dist. Bd. of Trs. of Valencia Cmty. College*, 414 So. 2d 634 (Fla.

5th DCA 1982).  Because a quantum meruit claim was neither pled nor tried by consent below, we direct the trial court, on remand, to enter judgment in favor of Harmon.

REVERSED and REMANDED.


EVANDER, KERRY I., Associate Judge, concurs.
TRAVER, DAN, Associate Judge, concurs, with opinion.
SASSO, MEREDITH L., Associate Judge, dissents, with opinion.

Traver, J., concurring.

I concur in the majority opinion. I write separately to address Judge Sasso's thoughtful dissent. I agree that a party's right to contract freely is essential, and we should not lightly strike down a contract as void against public policy. If I did not view as binding the Florida Supreme Court's decision in *Chandris, S.A. v. Yanakakis*, 668 So. 2d 180 (Fla. 1995), my vote would be different.

SASSO, J., dissenting.

The majority reverses the judgment entered in favor of Appellee by concluding that *Chandris, S.A. v. Yanakakis*, 668 So. 2d 180, 185-86 (Fla. 1995), requires this court to find, sua sponte, that the parties' fee-splitting agreement (the "Agreement") is illegal and unenforceable in this court. I disagree. *Chandris* does not require the result reached nor do the specific circumstances of this case justify it. Consequently, I dissent.

## I.      *Chandris* **does not require the result reached by the majority.**

The majority opinion suggests its determination in this case is required by *Chandris*. No doubt, the *Chandris* court wrote with broad strokes, stating: "a contingent fee contract entered into by a member of The Florida Bar must comply with the rule governing contingent fees in order to be enforceable." *Id.* at 185-86. But holdings in judicial opinions are not meant to be dissected and applied like statutes. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979). Instead, "[t]he proper approach is to 'read general language in judicial opinions . . . as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering.'" *Georgia v. Public.Resource.Org, Inc.*, 140 S. Ct. 1498, 1518 n.2 (2020) (Thomas, J., dissenting) (internal citations omitted). And here, mechanically extrapolating the broad language in *Chandris* extends its holding to quite different circumstances indeed.

In *Chandris*, the dispute arose after the *client* failed to honor a contingency fee contract that did not comply with the applicable rules. 668 So. 2d at 182. The violation, which was governed by the now-obsolete Code of Professional Responsibility, occurred

12

when a non-Florida lawyer, who was not subject to the code's requirements, entered into a contract providing for legal representation in Florida. *Id.* at 182-83. And when the client, six months later, subsequently executed a contract listing both the non-Florida lawyer and a Florida law firm as his attorneys, but was silent as to the division of fees, only the non-Florida lawyer signed it. *Id.* at 183.

Those facts make *Chandris* distinguishable in several material respects. First, due to the specific violations at issue in *Chandris*, the court did not evaluate the requirements violated in this case (the petition procedure delineated by rule 4-1.5(f)(4)(D)(iii)), as those requirements did not even exist in the previous code. More than that, the *Chandris* court only evaluated violations of DR 2-106, not the corollary to the rule at issue here, DR 2-107. *See id.* at 185-86 ("[W]e hold that a contingent fee contract entered into by a member of The Florida Bar must comply with **the rule** governing contingent fees in order to be enforceable.") (emphasis added). And because the contract in *Chandris* was governed by the Code of Professional Responsibility, not the subsequently adopted Rules Regulating the Florida Bar that govern the Agreement in this case, the *Chandris* court did not address the preamble to rule 4 or the several technical requirements that were added along with the adoption of the rule. *Id.* at 185 n.3.

Second, the *Chandris* court was primarily focused on public policy concerns not implicated here: the unlicensed practice of law and the resulting competitive disadvantage that would befall rule-compliant Florida lawyers. *See id.* at 181 ("[W]e find that Florida contingent fee agreements entered by attorneys not subject to our professional regulations are unauthorized legal services and are void as against public policy."); *Id.* at 185 ("If we were to hold a Florida contingent fee contract entered into by a person or

attorney who is not a member of The Florida Bar to be voidable rather than void, we would be recognizing the validity of a contract entered into by an attorney not subject to our regulations."). That concern appears to be what drove the *Chandris* court to respond to the certified question, "whether a fee agreement of a Florida law firm born of a fee agreement that is void as the unauthorized practice of law is itself void," with its sweeping statement that "contingent fee agreements entered into by attorneys subject to our regulations but which do not comply with the regulations are likewise void as against the public interest." And the line of cases *Chandris* also disapproved on public policy grounds implicated oral contracts, contracts that are wholly prohibited by the rule. *Id.* at 185. None of the cases disapproved by *Chandris* addressed otherwise authorized contracts that failed to comply with the rule's several technical requirements.

Finally, and significantly, the issue of the contract's potential illegality was presented to the *Chandris* court by way of a certified question, based on an issue preserved below and raised by the parties. *Id.* at 181-83. By contrast, the majority finds the contract illegal sua sponte. And while authority supports the proposition that the facial illegality of a contract may be raised sua sponte by any court, *see Rotemi Realty, Inc. v. Act Realty Co.*, 911 So. 2d 1181, 1185 n.1 (Fla. 2005), *Chandris* does not address whether the failure to substantially comply with rule 4-1.5(f)(4)(D)(iii) renders a contingency fee-splitting agreement facially illegal.

And so, because this case presents distinguishable facts, arises under different circumstances, implicates dissimilar public policy concerns, and evaluates subsequently

enacted rules from those considered in *Chandris*, I do not regard the holding in *Chandris* as requiring the result reached here.[5]

## II. Because *Chandris* does not require the result reached, I would not so hold.

Because I have concluded *Chandris* does not require this court to sua sponte declare the Agreement facially illegal, I next write to explain why this court should not reach the same result. The reason is two-fold and interrelated. Courts should be reticent to sua sponte invalidate contracts and the policy concerns implicated here do not justify such action.

---

[5] This is not a novel conclusion. Several courts, post-*Chandris*, have determined that contingent fee agreements can be enforceable even if they have technical or immaterial violations of the Rules Regulating the Florida Bar. *See, e.g., McCrimmon v. Centurion of Fla., LLC*, No. 3:20-cv-36-J-39JRK, 2020 WL 4785077, at *1 (M.D. Fla. Aug. 17, 2020) ("[T]echnical defects in a petition seeking approval of a fee-splitting agreement are not fatal if the attorneys have established a co-counsel relationship.") (citation omitted); *Wright v. Ford Motor Co.*, 982 F. Supp. 2d 1292 (M.D. Fla. 2013) (finding attorneys from two different law firms who represented clients in successful wrongful death action permitted to share contingent attorney's fees between them in 60%/40% division, rather than 75%/25% division presumed reasonable, even though petition did not strictly comply with applicable rule for justifying increased division of fees); *State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, 368 F. Supp. 2d 1296 (S.D. Fla. 2005) (finding contingent fee agreement was enforceable despite technical or immaterial violations of Florida Bar rule governing such agreements); *Guy Bennett Rubin, P.A. v. Guettler*, 73 So. 3d 809, 813 (Fla. 4th DCA 2011) (noting contingent fee agreements can be enforceable even if they have technical or immaterial violations of rule 4-1.5(d)); *Freedman v. Fraser Eng'g & Testing, Inc.*, 927 So. 2d 949, 954 (Fla. 4th DCA 2006) (finding even flawed contingency fee agreements can be enforceable and attorney's failure to send client proper closing statement did not preclude enforcement of charging lien); *Lackey v. Bridgestone/Firestone, Inc.*, 855 So. 2d 1186, 1188 (Fla. 3d DCA 2003) (holding that inclusion of unenforceable term should not void entire contract); *Corvette Shop & Supplies, Inc. v. Coggins*, 779 So. 2d 529, 531 (Fla. 2d DCA 2000) (refusing to invalidate entire contingency fee contract even though it contained violations of rule and noting rule was intended to protect client).

As a general rule, "[c]ourts typically do not strike down a contract, or any portion of a contract, based on public policy grounds except in extreme circumstances." *City of Largo v. AHF-Bay Fund, LLC*, 215 So. 3d 10, 15-16 (Fla. 2017). Consequently,

> [c]ourts . . . should be guided by the rule of extreme caution when called upon to declare transactions void as contrary to public policy and should refuse to strike down contracts involving private relationships on this ground, unless it be made clearly to appear that there has been some great prejudice to the dominant public interest sufficient to overthrow the fundamental public policy of the right to freedom of contract between parties sui juris.

*Id.* (quoting *Banfield v. Louis*, 589 So. 2d 441, 446-47 (Fla. 4th DCA 1991)); *see also Johnson, Pope, Bokor, Ruppel & Burns, LLP v. Forier*, 67 So. 3d 315, 318 (Fla. 2d DCA 2011) ("When determining whether a contract violates public policy, it is necessary to carefully balance the public interest with the right to freely contract." (quoting *Bituminous Cas. Corp. v. Williams*, 17 So. 2d 98, 101-02 (Fla. 1944))).

This case, however, does not require a belabored balancing analysis because both the preamble to rule 4-1.5 and the plain language of the rule itself address the enforceability of contingency fee contracts subject to the rule's requirements. Specifically, rule 4-1.5(d), entitled "Enforceability of Fee Contracts," provides:

> Contracts or agreements for attorney's fees between attorney and client will ordinarily be enforceable according to the terms of such contracts or agreements, *unless found to be illegal, obtained through advertising or solicitation not in compliance with the Rules Regulating the Florida Bar, prohibited by this rule, or clearly excessive as defined by this rule*.

(Emphasis supplied). The rule also explains what it means by "illegal, prohibited, or clearly excessive fees and costs" and that definition does not include contracts that contain technical violations of the rule's requirements. *See* R. Reg. Fla. Bar 4-1.5(a). And as to violations of the rules, the preamble to rule 4 states that the "failure to comply with an

16

obligation or prohibition imposed by a rule is a basis for invoking the disciplinary process," but a rule violation should not create a presumption that a legal duty has been breached. Preamble to R. Reg. Fla. Bar. 4.

Considering the plain language of the rule and preamble, I agree with the Southern District when it observed that the Florida Supreme Court's current standard to apply in determining whether a given fee contract is unenforceable in Florida "plainly require[s] more than merely technical or immaterial violation[s] of Rule 4-1.5." *State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, No. 97-7014-CV, 2004 WL 5500705, at *21 (S.D. Fla. Oct. 26, 2004). And applying this standard, I conclude the violations here are technical in nature, such that they do not render the contract facially illegal.

This conclusion is supported by the language of the rule violated – 4-1.5(f)(4)(D)(iii). Subsection (iii) requires that the parties petition the court to approve a fee-splitting agreement that exceeds the default arrangement and prescribes the content and form of the petition. R. Reg. Fla. Bar 4-1.5(f)(4)(D)(iii). But that subsection also demonstrates compliance or noncompliance with the petition process is not dispositive of whether the fee is appropriate. On one hand, a court-approved fee-splitting arrangement is still subject to scrutiny, and on the other, failure to petition the court for approval simply creates a presumption that the fee is excessive, which presumption may be overcome after a review of facts that would not be apparent from the face of the parties' contracts. *See* R. Reg. Fla. Bar 4-1.5(a)(1)-(2). This language differs from other provisions categorically prohibiting certain types of contracts. *See, e.g.*, R. Reg. Fla. Bar 4-1.5(f)(3) ("A lawyer must not enter into an arrangement for . . . a contingent fee for representing a defendant in a criminal case."); and R. Reg. Fla. Bar 4-1.5(f)(1) ("A contingent fee

agreement must be in writing . . . ."). Thus, it is clear that while the rules require strict compliance, they also contemplate that certain contracts are by their very nature prohibited and illegal, but the failure to comply with certain other technical requirements may have different implications.

The Middle District reached this same conclusion in *Wright v. Ford Motor Co.*, 982 F. Supp. 2d 1292 (M.D. Fla. 2013), regarding fee-splitting agreements that did not strictly comply with the Rules Regulating the Florida Bar. In *Wright*, the petition seeking court approval of a fee-split in excess of the default was not signed by either attorney to the agreement and did not disclose "in detail" the services to be performed. *Id.* at 1294. Recognizing *Chandris*'s holding, the court nonetheless concluded that the rule violations were not fatal, analogizing the case to those determining a fee contract that does not strictly comply with rule 4-1.5 is still enforceable by an attorney against his client if the violations are technical or immaterial. *Id. See also McCrimmon v. Centurion of Fla., LLC*, No. 3:20-cv-36-J-39JRK, 2020 WL 4785077, at *1 (M.D. Fla. Aug. 17, 2020) (concluding that "technical defects in a petition seeking approval of a fee-splitting agreement are not fatal if the attorneys have established a co-counsel relationship") (citation omitted).

My analysis does not stop here though because the majority decision also appears to place an emphasis on the number of violations in this case, characterizing the violations as "substantial." In this regard, I observe the following: the trial court's responsibility when reviewing an application for authorization of a fee division under rule 4-1.5(f)(4)(D)(iii) and the purpose of the subsection's requirements, is to ensure a true co-counsel relationship exists. *See* Comment to R. Reg. Fla. Bar 4-1.5. As the structure and language of the rule demonstrate, this is a factual issue.

18

It follows then that the significance of technical violations should be informed by the factual circumstances of each case. And the facts here are as follows: the parties did petition the court for approval of the Agreement. But as the majority notes, and I agree, Gerber failed to sign and swear to the petition (although it was signed by Harmon), the petition was not filed within 10 days of execution, and the petition did not disclose in detail the services to be performed, although it alleged that the law firms accepted substantially equal active participation and cited the court to the written contract for the law firms' responsibilities.[6]

We do not have a complete picture of what came next because the hearing at which Harmon presented the petition for approval was not transcribed. Consequently, we do not know what sort of inquiry the circuit court conducted in approving the Agreement, what additional information was or was not provided, and why the trial court was ultimately satisfied that a true co-counsel relationship existed. In other words, I would have to, in my view wrongly, assume trial court error in order to conclude that the technical deficiencies in the petition were not alleviated during the petition-approval proceeding. *Accord Ortiz v. Ortiz*, 227 So. 3d 730, 735 (Fla. 3d DCA 2017) (Luck, J., concurring in part) (noting that if "the appellant does not provide us with a transcript of the hearing, we should not presume the trial court failed to do its job").

---

[6] To the extent the majority concludes that the underlying fee agreement was rendered illegal because it was "silent" as to the requirement that attorneys accept substantially equal active participation, that conclusion appears to be at odds with the plain language of the rule, which only requires the parties "accept" equal participation—it does not require that acceptance be expressly memorialized in writing. *Accord Halberg v. W.M. Chanfrau, P.A.*, 613 So. 2d 600 (Fla. 5th DCA 1993) (concluding that referral agreement between referring and receiving attorney satisfied Florida Bar rules even though agreement did not explicitly state referring attorney assumed joint legal responsibility for client's representation).

**III.    On the merits.**

To summarize, I do not think *Chandris* reached the issue presented by this case nor dictates the result. In my opinion, the Agreement here was deficient due to technical rule violations which did not render it unenforceable. While I of course do not condone rule violations, I believe the consequences of those violations evade our purview, and I therefore would reach the merits of the appeal. And on the merits, I believe Harmon has presented one issue that justifies reversal for a new trial: the trial court erred by granting a directed verdict that the Agreement was not modified by the Closing Statement, in which Gerber agreed to a reduced fee.

Following the settlement of the client's claim, Harmon prepared a Closing Statement as required by the rules attributing 40.5% of the fees to Gerber, a decrease from the percentage contemplated by the Agreement. After the client and Harmon signed the Closing Statement, Harmon met with Gerber and explained the reasons for the new fee split, namely Harmon's need to bring in a third attorney to shore up a pendant bad faith claim after Gerber was accused of gross negligence. Gerber consented to the new fee distribution and signed the closing statement, but later, demanded the amount due under the original Agreement.

At trial, Harmon argued the Closing Statement was a binding modification of the Agreement, but the court accepted Gerber's argument that post-settlement modifications of contingency fee contracts were void and directed verdict in Gerber's favor, relying on *Lugassy v. Independent Fire Insurance Co.*, 636 So. 2d 1332 (Fla. 1994). However, the trial court's reliance on *Lugassy* in this context was misplaced.

In *Lugassy*, a lawyer and client had agreed that the lawyer's fee would be a percentage of any recovery from the insurer, but during trial they modified their agreement to make the fee equal to the amount awarded against the insurer under the statute allowing for fees when an insured is required to sue his insurer. *Id.* at 1333-34. As a result of the modification, the insurer's liability was increased and it challenged the validity of the modification. *Id.* at 1334-35. In addressing the issue, the Florida Supreme Court noted that an attorney who negotiates a contingent fee agreement does so based on an "uncertain future event" and a post-verdict modification could result in an "after-the-fact windfall." *Id.* at 1335. The court therefore concluded that it would not "approve a post-verdict modification of a fee agreement." *Id.*

By contrast, the agreement here neither reduced the recovery due to the client nor increased the exposure of a non-prevailing party. Rather, the agreement redistributed a previously determined amount of fees among three attorneys, who were on equal footing in their ability to appreciate the implications of the modification. Accordingly, the public policy underpinning *Lugassy* does not apply here, and the trial court should have considered whether the Closing Statement constituted a valid modification by applying traditional notions of contract law. And viewing the evidence in the light most favorable to the non-moving party as I am required to do, a jury could have concluded the Closing Statement was a binding modification. As a result, I would reverse the judgment entered in favor of Gerber and remand for a new trial.

21